McClendon, j.
| ¡Defendant, Donald Law, was charged by grand jury indictment on counts one and two with indecent behavior with juveniles, in violation of LSA-R.S. 14:81A(1), and pled not guilty as charged. After a trial by jury, defendant was found guilty as charged on both counts. The trial court denied defendant’s motion for post-verdict judgment of acquittal and motion for new trial. Defendant was sentenced to seven years imprisonment at hard labor on both counts, to be served concurrently. The trial court suspended five years of the sentences and imposed five years of supervised probation with special conditions, including registration as a sex offender, and payment of a fine of three thousand dollars. Defendant now appeals, challenging the sufficiency of the evidence, the admission of testimony about particular acts by defendant, the denial of the motion for mistrial, the treatment of one of the victims as a hostile witness, the denial of the *1167 motion for post-verdict, judgment of acquittal and the motion for new trial, and the imposed sentences. For the following reasons, we affirm the convictions and sentences.
STATEMENT- OF FACTS
In the summer of 2012, a group of children, including best friends C.G. ■ and M.W.[1] (the victims)) made plans to stay at the home of defendant and his wife Tulon-na Law before the group would attend a church camp in Florida. The victims lived in North Louisiana (in Caddo Parish) and during summer seasons, along with other children, often visited the Laws, who lived in West Baton Rouge Parish. The Laws did not have children of their own and defendant and C.G. are cousins.[2] On July 16, 2012, during the visit at issue, the victims were making cupcakes when defendant asked them to go with him to an upstairs bedroom. Once all three of them were in the bedroom defendant instructed the victims to turn off their cell phones and put them away.
| .¡Defendant then began a purported lecture with the girls on how to physically defend themselves if someone tried to'rape them, complete with physical demonstrations of attacks with each of the victims. During the purported demonstrations with M.W., defendant placed her in different positions, at one point asking her if she could feel his “stuff’ (further described by M.W. as his “private parts”). M.W. confirmed that she felt defendant’s, private parts against her during some of the demonstrations and that it made her uncomfortable. Defendant also informed the girls about sex, including instructing them on how. to perform a “hand job” and showing them a .book that portrayed sexual posh-tions with pictures of adults. After the victims told the church pastor about the incident, he reported it to the victims’ parents and the police. .
ASSIGNMENTS OF ERROR NUMBERS ONE, TWO, . SIX, AND SEVEN
In the first, second, sixth, and, in part, the seventh assignment of error, defendant argues that the evidence is insufficient to support the verdicts because there was no proof beyond a reasonable doubt that he intended to arouse or gratify his or the victims’ sexual desires. Thus, in assignments of error numbers one and two, the defendant contends that the jury erred in finding him guilty of indecent behavior with C.G. (assignment of error number one) and M.W. (assignment of error number two). Based on the same argument, defendant argues in assignment of error number six that the trial court erred in denying his motion for post-verdict judgment of acquittal. Likewise, in assignment of error number seven, defendant argues‘that the verdicts are contrary to the law and evidence and that the trial court erred in denying the motion for new trial (in part) on this basis.
A conviction based on insufficient evidence cannot stand as it violates Due Process. See U.S. Const, amend. XIV;, LSA-Const. art, I, § 2. The. standard of review for the sufficiency , of the evidence to uphold a conviction is whether or not, viewing the evidence in the light most, favorable to the prosecution, any rational trier of fact could have found the essential , ele *1168 ments of the crime beyond a reasonable doubt. Jackson v. Virginia, 443 U.S. 307, 319, 99 S.Ct. 2781, 2789, 461 L.Ed.2d 560 (1979). See also LSA-C.Cr.P. art. 821B; State v. Ordodi, 06-0207 (La.11/29/06), 946 So.2d 654, 660. The Jackson standard of review, incorporated in Article 821B, is an objective standard for testing the overall evidence, both direct' and circumstantial, for reasonable doubt. When analyzing circumstantial evidence, LSA-R.S. 15:438 provides that the fact finder must be satisfied that the overall evidence excludes every reasonable hypothesis of innocence. See State v. Paterno, 01-2585 (Lal.App. 1 Cir. 6/21/02), 822 So.2d 141, 144.
Indecent behavior with juveniles is, in pertinent part, the commission of any lewd or lascivious act upon the person or in the presence of any child under the age of seventeen, where there is an age difference of greater than two years between the two persons, with the intention of arousing or gratifying the sexual desires of either person.[3] Lack of knowledge of the child’s age shall not be a defense. LSA-R.S. 14:81A(1). Whether defendant committed a lewd or lascivious act upon the person or in the presence of C.G. and M.W., or whether any act committed was with the intention of arousing or gratifying his or the children’s sexual desires are the primary elements at issue on appeal. The supreme court in State v. Prejean, 216 La. 1072, 1078, 45 So.2d 627, 629 (1950) provided guidance on how to determine what constitutes lewd arid lascivious activity:
The word ‘lewd’ means lustful, indecent) lascivious, and signifies that form of immorality which has relation to sexual impurity or incontinence carried on in a wanton manner. The word ‘lascivious’ means tending to excite lust, lewd, indecent, obscene, relating to sexual impurity, tending to deprave the morals in respect to sexual relations.
Louisiana Code of Criminal Procedure article 821 provides that a motion for post-verdict judgment of acquittal shall be granted only if the court finds that the evidence, viewed in a light most favorable to the state, does not reasonably permit a finding of guilty. This is- a question of legal sufficiency. State v. Combs, 600 So.2d 751, 754 (La.App. 2 Cir.1992), writ denied, 604 So.2d 973 (La.1992). | (¡Louisiana Code of Criminal Procedure article 851(1) provides that the court shall grant a motion for new trial whenever the verdict is contrary to the law and the evidence. In ruling on a motion for new trial pursuant to LSA-C.Cr.P. art. 851(1), the trial court can only consider the weight of the evidence, and the trial court makes a factual review of the evidence as a thirteenth juror. State v. Steward, 95-1693 (La.App. 1 Cir. 9/27/96), 681 So.2d 1007, 1014. In contrast, an appellate court is constitutionally precluded from acting as a “thirteenth juror” in assessing what weight to give evidence in criminal cases, since, that determination rests solely within the discretion of the trier of fact. Steward, 681 So.2d at 1014. Appellate courts may review the grant or denial of a motion for new trial only for errors of law. See LSA-C.Cr.P. art. 858. ,
M.W. testified that once she,'C.G.,'and defendant entered the upstairs bedroom defendant closed the bedroom door though she was unsure as to whether or not it was locked. Defendant initially began talking to them about self-defense and steps they should take to avoid being raped. According to M.W., defendant told her to keep *1169 track of the timing as he began a demonstration with C.G. by instructing her' to stand up, grabbing her, and throwing her on the bed. M.W. testified that defendant positioned himself behind C.G., held one hand over her mouth, and used his other hand to hold her arms before throwing her on the bed and getting on top of her. M.W. further testified that defendant straddled C.G. with one leg on each side of her body. Based on her timing as instructed by defendant, M.W. approximated that the demonstration with C.G. lasted for six seconds.
According to M.W.’s testimony, defendant then began • a demonstration with M.W. wherein he told her to stand up and face away from him, and grabbed her arms after she complied. M.W. specifically testified as follows, “And, then he was like— he grabbed me and he pushed up against me. And, he was like, do you feel my stuff?. And, I was like, yes, meaning his private parts.” M.W. confirmed that she could feel defendant’s “private parts” pressed against her back and that it made her uncomfortable. M.W. then testified that defendant told her to come |fiback, indicating that he had more to show her. At this point, as he' faced M.W., he grabbed her leg and pulled it between his legs, stating that she should knee an attacker in that manner. M.W. confirmed that when defendant pulled her leg up, he pressed it against his private parts and that, as a result, she felt his private parts again. She stated that defendant was wearing shorts and that he did not have an erection at that moment.
Defendant then told the girls to sit down as he began talking about sex education, which included instructions to spit in their hands if necessary while doing a “hand job.” M.W. further testified, “And, then he said, ‘I’m going to be honest with y’all, y’all are beautiful, elegant, young ladies and y’all turn me on.’” At this point, deféndant had an erection. Defendant also showed the girls a book with pictures of males and females in sexual positions. M.W. testified that before this incident she had never seen 'such a book, but knew such a book existed. Defendant gave the book to the victims and told them to hide it under the mattress, and not to tell then-parents about the book and what occurred in the bedroom. After they left the room, the girls went into the game room where the other children were and told Noah Vanalstyne (defendant’s nephew who gréw up with M.W. as his mother dated her father) what happened. The next day the girls told defendant’s wife, “Nonna,” about the incident, but she did not* believe them. When they went' to retrieve the book that they placed under the mattress,, it was goné. They subsequently relayed the incident to others including their church pastor, Tom Shepard, who also confirmed being' told about the incident and stated that the girls were upset when he spoke to them. Pastor Shepard reported the incident to the police and the victims’ parents.
M.W. testified that, she ¡did not attend the church camp that summer, that she never visited the Laws again after the incident, that she had no intentions of ever doing so again, and that she felt violated. When asked how the book made her feel, she stated that it made her feel uncomfortable and confirmed that she thought it was gross. She further responded positively when asked if the book was more explicit .than anything she was shown at school during sex education,
^During cross-examination, M.W. confirmed that she stayed at defendant’s residence “a bunch of times” before this incident and that defendant had never said or done anything that she thought was inappropriate during the earlier visits. M.W. denied that the Laws ever spoke to' her *1170 about wearing inappropriate or revealing clothing-or about her exhibiting inappropriate behavior. The defense counsel further asked, “They didn’t complain about you going up to guys you didn’t know and giving them your phone number?” In response, M.W. stated, “I never gave anybody my phone number, so, no, sir.” When asked about other specific allegations of potentially inappropriate behavior, M.W. denied them stating in part, “I never did any of that, so, no, sir.” When asked if defendant touched her in a place where he should not have touched her, M.W. stated, “No. But, he touched me with his private parts, and that is something he should not have done.”
C.G. testified that she could not recall the incident as well as M.W, and, unlike M.W., she remained in the home after the incident and attended the church camp as planned. C.G.. testified that she did not remember the bedroom door being closed during the incident. She further testified, “I know he took us to the room to talk to us about self-defense, and stuff like if somebody was trying to hurt us ... And, then it kind of like when [sic] from one thing to another to like stuff that shouldn’t have happened.” When specifically asked if defendant grabbed her, C.G. stated, “I think so. I don’t really remember that day as much as [M.W.] does, but I guess he did.” C.G. recalled defendant conducting a demonstration with her and asking M.W. to time the demonstration, but did not remember defendant straddling her during the demonstration. C.G.' also recalled one of the demonstrations with M.W., confirming that defendant pulled M.W. to him, and that M.W. responded positively after defendant asked her if she could feel his stuff, which C.G. described as being defendant’s “private parts” and “penis.” C.G. did not recall a demonstration with M.W.’s knee, but did recall defendant talking to them about “the hand job stuff, about spitting on it and all that,” and further remembered defendant showing them a book. C.G. described the book as follows, “It had sex positions with people, nude people.” C.G. stated |sthat she was not interested in the book and confirmed that she thought.it was gross and stated that it made her feel “.[u]ncomfortable.” C.G. testified that she did not see defendant with an erection, confirming that she did not look in order to be able to make that determination. She confirmed that they hid the book “under the bed” as instructed by defendant. C.G. further confirmed that she and M.W. immediately told Noah about the incident after leaving 'the bedroom, and that they subsequently told “Nonna” and Pastor Tom. C.G. confirmed that Nonna did not believe them, adding, “She was pretty upset” and “She was crying.” C.G. responded positively when she was questioned as follows, “Do you remember Uncle Don telling y’all that y’all were beautiful, elegant ladies and-y’all turn him on?”
On cross-examination, C.G. was asked if before the incident ⅛ question there had been complaints about how she and M.W. dressed and she stated, “That’s what I was told.” She confirmed that Nonna previously complained about their conduct, but stated that she did not recall anyone giving their telephone number out. She responded positively when asked if the reason for the discussion by defendant was to warn them due to the possibility that they would give boys the wrong impression based on how they acted and dressed.. She testified that defendant did not touch her inappropriately while showing her defensive moves, and confirmed that she continued to visit the Laws after the incident. On re-direct examination, C.G. denied hearing defendant tell her and M.W. not to tell anyone about the incident.
*1171 Detective Chris Conaway of the West Baton Rouge Parish Sheriffs Office investigated the incident at issue after it was reported to the police. Both victims gave written , statements detailing the incident and defendant was asked to come into the detective’s office to discuss the incident. Detective Conaway testified that after being advised of his rights, defendant agreed to make a statement. Before invoking his rights, defendant confirmed being in the bedroom with the victims and stated that he wanted to show the youiig ladies-how to defend themselves if they were, ever approached by someone who was trying to abduct or rape them. |flDetectjve Cona-way testified that the book that the victims indicated defendant showed and gaye to them was never recovered. Detective Conaway confirmed that in .the interviews he conducted .with the victims, both of them made statements: that. were, consistent with the rendition of the facts provided in their- previous written police statements. The results of his investigation, including, the .written and verbal statements by the victims, were consistent with the victims’ trial testimony.
Noah (defendant’s nephew) testified- at the trial and-confirmed that defendant was in the bedroom alone with1 the girls that day with the door closed.' He further testified that after all three Of them exited the bedroom, the girls seemed upset and he could tell something happened. While C.G. stood by in agreement, M.W. relayed to Noah the details about the demonstrations, - statements by defendant, and the book of sexual positions given to them by defendant. Noah’s testimony was generally consistent with the victims’ testimony.
Defendant’s son, Andrew Law, testified as a defense witness at the trial. Andrew was twenty-two years old at the time of the trial. He recalled the victims would normally visit them over the summertime. When asked about their attire, Andrew testified that the girls would normally wear “short shorts and tank tops, stuff like that.” He testified that the victims sometimes made him uncomfortable by “scooting” close to him while they watched television, sitting on his lap, or putting then-legs across his lap. He stated that whenever this would happen he would separate himself from them and sometimes sit on the floor away from them. He confirmed that the victims never tried to kiss him or hold his hand.
Defendant’s mother, Sandra Law, testified that prior to the incident in question, defendant, his wife, and the victims came to her home in Texas .and stayed there for about a week. She stated that she was disturbed -by the way the girls dressed, stating: that they .wore short shorts that would expose their crotch when they‘would bend over. She also stated that their tops were short such that their navels and midriff would often be exposed. She stated that she told Tulonna Law to speak to them about their attire. .
ImDestinee Lamb (whose age was not given) was one of the youths present in the Laws home at the time of the incident. She testified that she also visited the Laws almost every summer and that she knew them because her father and Tulonna Law were co-workers. She confirmed that defendant had a discussion with the victims in the bedroom on the day in question. She stated that the door was only partially closed. She also testified that when she saw defendant enter the bedroom with the victims, she was not surprised and assumed that he was going' to talk them about the inappropriate way they were dressing and acting. She did not.nqtice' anything unusual when they exited the bedroom and confirmed that Noah was also present at the time. She confirmed that defendant never made any sexual ad- *1172 vanees towards her. On cross-examination, Destinee further confirmed that she could not hear what was being said or happening in the bedroom.
C.G.’s mother also testified as a defense witness. She confirmed that she allowed C.G. to remain at the Laws’ residence after Pastor Shepard reported the incident, noting she drove over there the next morning and stayed at her nephew’s house with the victim to allow her to attend church camp. She stated that she felt her daughter was safe. She confirmed that she did not give defendant permission to talk to her daughter about sex or show her a book of sexual positions.
Tulonna Law, defendant’s wife, testified that she and defendant did not have any children together though defendant had a son from a previous marriage. She further stated that the victims would stay with them almost every summer and during other school breaks. She confirmed that she had problems with the victims before the incident in question, specifically testifying that they dressed inappropriately, and were “acting out” in front of guys and asking for phone numbers. Tulonna testified that during a trip to McDonald’s, the girls were “shaking their booties” as they walked, attempting to draw attention from boys who were present. She stated that she was concerned and noted that she took the girls shopping for more appropriate attire. She stated that she previously | ^reprimanded the girls for laying on the bed with a male visitor and for laying on the bed with Andrew, defendant’s son, and putting their feet and legs across his legs in an “inappropriate” manner.
Tulonna further testified that she was home but was not in the bedroom when defendant talked to the victims after her mother-in-law suggested that someone needed to talk to them. She noted that she was not feeling well at the time and decided to let defendant handle speaking to the girls. According to her, three other children were present in the upstairs game and television room. She did not hear anything that was stated or occurred in the bedroom and did not notice anything unusual when defendant and the victims exited the bedroom. Tulonna confirmed that the victims talked to her about the incident, specifically stating that the victims told her defendant 'was teaching them self-defense and that they giggled and joked about being uncomfortable. When asked if the victims made any complaints about defendant crossing the line, she stated that the victims were concerned about some things. She stated that after she talked to them more, she noticed that they were upset by the incident, but added that she could clearly understand what defendant was trying to convey to the girls. Tulonna confirmed that they had a paperback book in the home that she and defendant received as a wedding gift that revealed women’s breasts but no other private areas. She stated that she burned the book after defendant was arrested. While on cross-examination, Tulonna confirmed that the victims told her that defendant showed them the book and left it with them. . She- confirmed that the book included pictures of sexual positions with nude individuals, but only female breasts were visible. She denied that the .victims told her defendant, asked M.W. if she could feel his private parts. Tulonna testified that there were never any complaints from any of. the other children that stayed at their house.
Tracey Hebert lived across the street from the Laws and noted that they became friends over a period of time. Hebert noted that her youngest son was friends with defendant’s son, that her son would visit them, and that they were members of the same youth church group. Kirt Rivet *1173 was a member of the same | iachurch as the Laws. Rivet testified that he had two beautiful daughters, one twenty-two years old and one twenty years old, who visited the Laws’ residence a couple of times and went to school with Andrew. Hebert and Rivet confirmed that defendant had a good reputation in the community for being truthful.-
Defendant testified as the final defense ■witness. Defendant confirmed that he did not have a criminal record and that he was active in the church. He stated that it was routine for teenage girls to come over and stay in their home since the beginning of his marriage and that there were never any complaints before this incident. He stated that the incident in question involving the victims was prompted by the fact that he observed the girls being inappropriately dressed, especially when boys were around. He recalled the incident at McDonald’s when the girls tried to gain the attention of a group of boys and another incident involving his son’s friends where he chastised the girls for sitting across the boys’ laps.
Regarding the day in question, defendant confirmed being in the bedroom with the victims and stated that the door was not fully closed. He' stated that they started the conversation by talking about bad behavior and noted that he was very upset with the girls at the time due to how they were conducting- themselves. He talked to them about “bad things” that could happen, including murder, kidnapping, and rape and discussed different scenarios with them. Defendant confirmed that he showed the girls defensive moves and explained that kicking a man in the groin could help subdue him. He stated that he instructed the girls to face an attacker and "to never turn their back. He confirmed that he did “come up behind” both girls at one point and explained-to them that he was going tó put his arms around them and instructed them to show him'how they would turn abound' and hit or kick him in response. He stated that the girls never screamed or cried or look frightened. Defendant denied asking the victims if they could' feel his stuff. He confirmed that he told the girls that they should-wait until marriage before having sex. • He talked to them about relationships and how they could obtain “material” if they wanted to know more about relationships. ■ ■ ;
11sWhen asked if he talked to the girls about “a last resort to keep from getting raped,” defendant testified, “I told them, I said — I told them to spit on their hand and satisfy the guy as best you can. If it keeps you from getting raped, I said, that’s a plus in your favor.” Then he instructed the girls to take control arid hit the individual in the throat or “put his eyeballs out.” He confirmed that he showed the girls a book about ■ relationships that he -and his wife received as a wedding gift and stated that he had not looked at the book in years and just flipped through the- 'pages and gave it to the victims. Defendant stated that he later told his wife that his actions “probably wasn’t the best of things to do,” but confirmed that he had good intentions. Defendant also confirmed that he told the victims that' they were beautiful and elegant girls, but denied that he ever told them that they turned him on and denied having an erection at any time during the incident. • He stated that he would have handled it differently if he had to do it over and that he did apologize to the girls. Defendant denied doing or saying anything to arouse or gratify the sexual desires of himself or the victims and denied telling them not to tell anyone about the incident.
. Pastor Shepard was recalled by the State on rebuttal and confirmed that the *1174 church had policies and procedures regarding children’s attire for church functions and. that the victims were never sent home or reprimanded due to their attire. Pastor Shepard testified that he would not allow defendant to work-.with his youth after the incident in question...
The jury heard the testimony presented at ■ trial and found defendant guilty as charged on both counts. In the absence of internal contradiction or irreconcilable conflict with the physical evidence, one witness’s testimony, if believed by the trier of fact, is sufficient to support a factual cpn-clusion. State v. Higgins, 03-1980 (La.4/1/05), 898 So.2d 1219, 1226, cert. denied, 546 U.S. 883, 126 S.Ct. 182, 163 L.Ed.2d 187 (2005). The trier of fact is free to accept or reject, in whole or in part, the testimony of any witness. Moreover, when there is conflicting testimony about factual matters, the resolution of which depends upon a determination of the credibility of the witnesses, the matter is one of the weight |uof the evidence, not its sufficiency. The trier of fact’s determination of the weight to be given evidence is not subject .to appellate review. An appellate court will not reweigh the evidence to overturn a fact finder’s determination of guilt. State v. Taylor, 97-2261 (La.App. 1 Cir. 9/25/98), 721 So.2d 929, 932. We are constitutionally precluded from acting as a “thirteenth, juror” in assessing what weight to give evidence in criminal cases. See State v. Mitchell, 99-3342 (La.10/17/00), 772 So.2d 78, 83. The fact that the record contains evidence which conflicts with the testimony accepted by a trier of fact does not render the evidence accepted by the trier of fact insufficient. State v. Quinn, 479 So.2d 592, 596 (La.App. 1 Cir.1985).
When a'case involves circumstantial evidence and the jury reasonably rejects the hypothesis of innocence presented by the .defendant’s own testimony, that hypothesis falls, and the defendant is guilty unless there is another hypothesis that raises a reasonable doubt. State v. Captville, 448 So.2d 676, 680 (La.1984). We find no such.hypothesis exists in the instant case. The verdict rendered in this case indicates the reasonable conclusion that based on the testimony, including defendant’s own admissions, defendant committed lewd or lascivious acts upon the persons of M.W. and C.G., both victims herein. In finding defendant guilty, the jury clearly rejected defendant’s theory of innocence. In reviewing the evidence, we cannot say that the jury’s determination was irrational under the facts and circumstances presented to them. See Ordodi, 946 So.2d at 662. An appellate court errs by substituting its appreciation of the evidence and credibility of witnesses for that of the fact finder and thereby overturning a verdict on- the basis of an exculpatory hypothesis of innocence presented to, and rationally rejected by the jury. State v. Calloway, 07-2306 (La.1/21/09), 1 So.3d 417, 418 (per curiam). .After a thorough review of the record, we are convinced that, viewing the evidence in the light most favorable to the State, any rational trier of fact could have found beyond a reasonable doubt, and to the exclusion- of every reasonable hypothesis of innocence, that the defendant was guilty of two counts of indecent behavior with juveniles. Thus, the trial court .did not err in denying the | ^motion for post-verdict judgment of acquittal. Further, as aforementioned, the denial of a motion for new trial, on the basis that the verdict was Contrary to the law and evidence is not subject to review on appeal. State v. Hampton, 98-0331 (La.4/23/99), 750 So.2d 867, 880, cert. denied, 528 U.S. 1007, 120 S.Ct. 504, 145 L.Ed.2d 390 (1999). Assignments of error numbers one, two, six, and seven (as inso *1175 far as it challenges the evidence) are without merit.
ASSIGNMENTS OF ERROR NUMBERS THREE AND SEVEN
In the third assignment of error, defendant contends that the trial court erred in allowing the State, over defense objection, to ask about particular acts while questioning witnesses who testified about defendant’s reputation. Defendant notes that a comment on LSA-C.E. art. 608 refers to State v. Johnson, 389 So.2d 372 (La.1980), regarding the safeguards the trial court should consider before permitting such questioning. Defendant also notes that this was one of the grounds for his motion for new trial and contends that it should have been granted on that basis.
Louisiana Code of Evidence article 611B provides that a “witness may be cross-examined on any matter relevant to an issue in the case.” The scope of cross-examination is not limited to matters covered on direct examination. A witness who has testified to the character for truthfulness or untruthfulness of another witness may be cross-examined as to whether he has heard about particular acts of that witness bearing upon his credibility. LSA-C.E. art. 608C; see also LSA-C.E. art. 405A. Cross-examination of a character witness may extend to his knowledge of particular misconduct, prior arrests, or other acts relevant to the moral qualities pertinent to defendants crime. Such inquiries expose the witness’ possible lack of knowledge of . defendant’s character. Although Johnson delineated certain safeguards regulating prosecution cross-examination of character witnesses, the ultimate question is whether there whs undue jury | ^prejudice from the prosecutor’s cross-examination.[4] State v. Sepulvado, 93-2692 (La.4/8/96), 672 So.2d 158, 167, cert. denied, 519 U.S. 934, 117 S.Ct. 310, 136 L.Ed.2d 227 (1996).
Herein, before defendant testified, the defense .called two character witnesses, Tracey Hebert and Kirt Rivet, who testified as to defendant’s reputation for being truthful. During the cross-examination of Hebert and Rivet, the State asked if they were aware that’defendant showed, the victims a book depicting sexual positions and gave them instructions on how to do a hand job. The State further asked Rivet if he knew about the statements defendant made to the victims or about defendant having an erection while talking to the victims. The defense attorney contemporaneously objected to the line of questioning during the cross-examination of the initial witness, Hebert, arguing that the questioning had nothing to do with defendant’s reputation in the community. The trial court ruled that the .questioning was *1176 fair and allowed the witnesses to answer the questions. Hebert testified that she did not know anything about a book until Tulonna told her about it a week before the ■ trial. The witnesses denied having any knowledge of the other specific allegations in this case.
We find that the scope of the cross-examination of Hebert and Rivet was proper. See LSA-C.E. art. 611B; LSA-C.E. art. 608A;. LSA-C.E. art. 405A; Sepulvado, 672 So.2d. at 167. We further find that defendant’s reliance upon State v. Johnson is misplaced. Johnson provided safeguards in addressing |17cross-examina-tion of a character witness regarding “convictions, arrests, or other misconduct” of the accused that'may have occurred prior to the “present offense.” Johnson, 389 So.2d at 374-76. In his brief, defendant outlines the Johnson factors but fails to argue how they apply to the specific questions posed to the witnesses by the prosecution in this case. The questions at issue herein concerned conduct by defendant set forth in trial testimony regarding the instant offenses as opposed to any prior conduct. Furthermore, a trial, court’s failure to conduct a Johnson hearing or to comply with its guidelines will not automatically result in reversible error. State v. Berryhill, 562 So.2d 1105, 1109 (La.App. 4 Cir.1990) (citing State v. Rault, 445 So.2d 1203 (La.1984), cert. denied 469 U.S. 873, 105 S.Ct. 225, 83 L.Ed.2d 154 (1984)). In the instant case, since the subject matter of the cross-examination did not concern prior crimes, acts or misconduct of the accused, a Johnson hearing was not required. Further, defendant has failed to show any undue prejudice. We find that the trial court did not commit reversible error by allowing the prosecution to ask its questions without first conducting a Johnson hearing and did not err in denying the motion for new trial on this basis. Thus, assignments of error numbers three and seven (to the extent that it challenges the State’s questioning of the character witnesses) are without merit.
ASSIGNMENT OF ERROR NUMBER FOUR
In the fourth assignment of error, defendant contends the trial court erred in ■denying his motion for mistrial based on testimony by the investigating officer about defendant terminating his police statement. Defendant notes that he had a constitutional right to not make a statement of any nature and could terminate a statement at any point. Thus, defendant argues it was inappropriate for the investigating. officer to make the statement that he refused to answer any further questions.
Under the authority of LSA-C.Cr.P. art. 771, where the prosecutor or a witness makes a reference to a defendant’s post-arrest silence, the trial court is required, upon the request of the defendant or the State, to promptly admonish the jury. In such cases where the court is satisfied that an admonition is not | ^sufficient to assure the defendant a fair trial, upon motion of the defendant, the court may grant a mistrial. State v. Kersey, 406 So.2d 555, 560 (La.1981). However, a mistrial is a drastic remedy, which should be granted only when the defendant suffers such substantial prejudice that he has been deprived of-any reasonable expectation of a fair trial. Determination of whether a mistrial should' be granted is within the sound discretion of the trial court, and the denial of a motion for mistrial will not be disturbed on appeal without abuse of that discretion. State v. Berry, 95-1610 (LaApp. 1 Cir. 11/8/96), 684 So.2d 439, 449, writ denied, 97-0278 (La.10/10/97), 703 So.2d 603.
*1177 In Doyle v. Ohio, 426 U.S. 610, 619, 96 S.Ct. 2240, 2245, 49 L.Ed.2d 91 (1976), the Supreme Court of the United States held that the use, for impeachment purposes, of the defendant’s silence at the time of arrest and after receiving the Miranda warnings, violates the Due Process Clause of the Fourteenth Amendment. See Portuondo v. Agard, 529 U.S. 61, 74-75, 120 S.Ct. 1119, 1128, 146 L.Ed.2d 47 (2000); Miranda v. Arizona, 384 U.S. 436, 86 S.Ct. 1602, 16 L.Ed.2d 694 (1966). However, not every mention of the defendant’s post-arrest silence is prohibited by Doyle. .As emphasized by the Louisiana Supreme Court in State v. George, 95-0110 (La.10/16/95), 661 So.2d 975, 980, Doyle prohibits only the use of the defendant’s post-arrest silence for impeachment purposes.
On direct examination by the State, Detective Conaway testified that after defendant was advised of his rights, he initially explained that he was teaching the victims how to defend themselves. The detective then testified that after he began to question defendant about the sexual nature of the discussion that he had with the victims, defendant “stated that he had spoken to his attorney and he didn’t wish to discuss that with detectives.” After this statement, the State diverted from defendant’s invocation of his rights and asked the detective to confirm that defendant discussed the self-defense part of the incident, and the detective responded positively. There was no objection at this point. The questioning continued on direct examination without any further references to defendant exercising his right to remain silent and to counsel.
|13On cross-examination, the defense counsel asked the following lengthy question regarding what defendant stated during the brief police interview.
Q. Now, you testified as to what Donald Law said. Isn’t ... that what your report says about Donald Law is that he said that he didn’t touch the victims in any fashion that would indicate he desired sexual contact. He did say that he was trying to teach the victims on how they should conduct themselves while in the presence of the opposite sex. Donald also said that he was explaining on how other people perceive others just on appearance and how to be more respectful of themselves by acting and dressing certain ways. Donald also stated he was showing the victims on [defensive] moves that they could use on people when they tried to abduct them. He advised that while he was telling them where to kick the alleged bad guy, he was also showing them, as well.' Isn’t that the statement made by Donald Law?
Thé detective responded positively, stating that if the statements made by the defense attorney came from his report, then they consisted of defendant’s statements.
On re-direct examination, the State asked, “Once you asked about the sexual nature, the conversation ceased, right?” The detective responded, “Yes, sir, he invoked his right to have his attorney present.” At this point, the defense counsel moved for a mistrial and the jury was removed from the courtroom. The trial court noted that there had been no reference to .defendant’s failure to testify and denied the motion for mistrial. There was no request for an admonition.
A brief reference to post-arrest silence does not mandate a mistrial or reversal where the trial as a whole was fairly conducted, the proof of guilt is strong, and the State made no use of the silence for impeachment. See State v. Smith, 336 So.2d 867, 868-70 (La.1976) (per curiam); see also State v. Stelly, 93-1090 *1178 (La.App. 1 Cir. 4/8/94), 635 So.2d 725, 728-29, writ denied, 94-1211 (La.9/23/94), 642 So.2d 1309. Further, the State is allowed reference to the defendant’s post-arrest silence when the line of questioning is an attempt to summarize the extent of the police investigation and is not designed to exploit the defendant’s failure to claim his innocence after his arrest in an effort to impeach his testimony or attack his defense. See George, 661 So.2d at 979-80.
In this case, we find that the references to post-arrest silence did not - warrant a mistrial. Though reference was made to defendant’s post-arrest silence, l^we find that it was minimal and the. trial as a whole was conducted fairly.- The initial reference was clearly not in direct response to the question asked by -the State and the State quickly diverted- after the response. The defense attorney on cross-examination raised defendant’s statement again in. much greater detail than the State, and the State responded on re-direct. It does not appear.that the State pursued the above line of questioning for the purpose of calling the jury’s attention to the defendant’s post-arrest silence or having the jury make an inappropriate inference, but to address the claims made during cross-examination. Moreover, the testimony in question was not used for impeachment purposes. Accordingly, defendant’s post-arrest silence was not used against him within the meaning of Doyle. We find that he did not suffer such, substantial prejudice that he was deprived of any reasonable expectation of a fair trial. Thus, we find no abuse of discretion in the trial court’s denial of defendant’s motion for mistrial. Assignment of error number four is without merit.
ASSIGNMENTS OF ERROR NUMBERS FIVE AND SEVEN
In the fifth assignment of error, defendant contends that the trial court erred in allowing the State to treat C.G. as a hostile witness. Defendant: notes that the State was allowed to cross-examine C.G. over defense objection. Defendant contends that C.G. was called by the State and identified with the State, not defendant. Defendant notes -that the State did not establish outside the presence of the jury that C.G. was an unwilling or hostile witness prior to asking leading questions. Defendant argues that he was prejudiced by this abuse of the trial court’s discretion. Defendant also contends in his seventh assignment of .error that this was one of the grounds for his motion for new trial and that it should have been granted on that basis.
Generally, leading questions should not be used on the direct examination of a witness except as may be necessary to develop his testimony and in examining an expert witness'on his opinions and inferences. However, when a party calls a hostile witness, a witness who is unable or unwilling to respond to proper questioning, an adverse party, or a witness identified with an adverse party, | ¾1 interrogation may be by leading questions. The use of leading questions is largely within the discretion of the trial court; and only a clear abuse of that discretion which prejudices the defendant’s rights will justify the reversal of a conviction. State v. Young, 576 So.2d 1048, 1056 (La.App. 1 Cir. 3/5/91), writ denied, 584 So.2d 679 (La.1991).
When initially asked to tell the jurors what happened on the day in question, C.G. testified, “I don’t know how to put it in words. Like, I can’t do it with all these people in front of me.” During subsequent testimony, C.G. repeatedly indicated that she had difficulty recalling all of the details of the incident. Even after the trial court allowed the State to refresh the *1179 victim’s memory by showing her the statement that she made to the police after .the incident, the victim continued to have difficulty remembering some of the facts. After a defense objection to a leading question, the jury was asked to exit the courtroom and the State moved to have C.G. referred to as a hostile witness. The State noted that C.G. was a blood relative of defendant, that their relationship and pressure of the situation contributed to her inability to recall all of the facts. The trial court allowed the defense to respond and then noted that a friendly witness can sometimes become hostile. The trial court allowed the State to question C.G. outside of the presence of the jury to determine if she had become a hostile witness.
When the State questioned C.G. outside of the presence of the jury, she confirmed that her mother would not allow her to speak to the prosecutor when he asked to speak to her before the trial began. She stated that she had trouble recalling the incident because of the amount of time that passed between the incident and the trial, which was nearly two years.[5] The victim confirmed that her statement to the police was truthful, and agreed that it would be more accurate than her trial testimony. The victim also confirmed that she had been told before the trial that her uncle would go to jail if found guilty, but denied that it had any effect on her testimony. In ruling in favor of the State, the trial court concluded 122that it was obvious that C.G. had become a hostile witness, noting that she did not want to be there and was in an uncomfortable and untenable position. After the ruling, the jury was brought back into the court room and the State was allowed to ask C.G. leading questions. The victim gave positive responses to some of the leading questions, while maintaining negative responses ■ or reiterating her inability-to remember as to others.
: Herein, we'find no abuse of discretion in the trial court’s ruling allowing'C.G. to be considered a hostile witness and to be asked leading questions. We do not accept defendant’s argument that the witness was identified with the State rather than the defense. The victim (defendant’s much younger second cousin) referred to defendant as her uncle and noted from the beginning of her testimony that she would have difficulty saying what happened in front of everyone. She also confirmed that she had been made aware of the' possibility of her “uncle” going to jail. Although she was about the same age as the other victim, she seemed to have much more difficulty answering direct questions' about the incident. Once she was allowed to look at her statement, she continued to state that she was unable to recall some of the details. Therefore, the .trial court correctly ruled that, pursuant to Louisiana Code of Evidence article 611C,; the prosecution could use leading questions during the direct examination of this witness. Even assuming, arguendo, that the trial court erred in allowing the prosecution to use leading questions under these circumstances, we find no prejudice in this case that would justify a reversal of the convictions. Although the State was allowed to start using leading questions, the victim did not provide significantly more details than had already been provided before the ruling when the questions were not leading. Although defendant made a general claim that he was prejudiced by the line of leading questions, he has failed to allege *1180 sufficient prejudice to justify a reversal of his conviction. Accordingly, we find that the trial court did not err in denying the motion for mistrial on this basis. Based on the foregoing reasons, we find that assignments of error numbers five and seven (to the extent that it challenges the questioning of C.G. as a hostile witness) are without merit.
^ASSIGNMENTS OF ERROR NUMBERS EIGHT AND NINE
In the eighth and ninth assignments of error, defendant argues that the trial court erred in imposing the sentences. Specifically, in the eighth assignment of error, defendant notes that he maintained his innocence at the sentencing hearing and claims that the trial court considered that an aggravating factor in imposing the sentences. In the ninth assignment of error, defendant contends that the trial court erred in imposing an excessive sentence.[6]
A thorough review of the record indicates that defendant did not make or file a motion to reconsider sentence following the trial court’s imposition of the sentences. Under LSA-C.Cr.P. arts. 881.1E and 881.2A(1), the failure to make or file a motion to reconsider sentence shall preclude defendant from raising an objection to the sentence on appeal, including a claim of exeessiveness. See State v. Mims, 619 So.2d 1059 (La.1993) (per curiam). Defendant, therefore, is procedurally barred from having assignments of error numbers eight and nine reviewed, because he failed to file a motion to reconsider sentence after being sentenced. See State v. Duncan, 94-1563 (La.App. 1 Cir. 12/15/95), 667 So.2d 1141, 1143 (en banc per curiam). The eighth and ninth assignments of error are without merit.
CONCLUSION
For the foregoing reasons, we affirm defendant’s convictions and sentences.
CONVICTIONS AND SENTENCES AFFIRMED.
THERIOT, J., concurs.

. At the time of the offenses, C.G. was fourteen years old and M.W, was fifteen years old. Herein, only initials will be used to identify the victims. See LSA-R.S. 46:1844W,

. C.G. specifically testified that her mother's sister (her aunt) is defendant’s mother. Though they are cousins, presumably due to the age difference, she referred to defendant as "Uncle Don,”

. As previously noted, the victims in this case were fourteen and fifteen years old. Defendant’s date of birth is August 10, 1965; thus he was forty-six years old at the time of the offenses.

. According to the Johnson safeguards, before permitting the prosecuting attorney to cross-examine the character witness on rumors of misconduct of the accused the trial court should determine out of the presence of the jury:
(1) that there is no question as to the fact of the subject matter' of the rumor, that is, of the previous arrest, conviction, or other pertinent misconduct of the defendant;
(2) that a reasonable likelihood exists that the previous arrest, conviction or other pertinent misconduct would have been bruited about the neighborhood or community pri- or to the alleged commission of the offense on trial; ■
(3) that neither the event or conduct nor the rumor, concerning it occurred at a time too remote from the present offense;
(4) that the earlier event or misconduct and the rumor concerned the specific trait involved in the offense for which the accused is on trial; and ■
(5) that the examination will, be conducted in the proper form, that is: ‘Have you heard,’ etc., not ‘Do you know,’ etc.
Johnson, 389 So.2d at 376; see also LSA-C.E. art. 405, comment (c).

. The trial began on June 16, 2014 and as stated, the offenses occurred on July 16,-2012 in accordance -with the trial testimony and the State’s amendments to the grand jury indictment.

. We note that the defendant filed a supplemental brief to further address the argument under assignment of error number nine of the original appeal brief.