McCLENDON, J.
Defendant, Scott Alan Barr, was charged by bill of information on counts one and two with sexual battery of a victim under the age of thirteen, violations of LSA-R.S. 14:43.1C(2), and he entered a plea of not guilty. After a trial by jury, defendant was found guilty of the responsive offense of sexual battery, as to each count. Defendant was sentenced on each count to ten years imprisonment at hard labor without the benefit of probation, parole, or suspension of sentence, to be served concurrently. Defendant now appeals, assigning error to the trial court's denial of his motion for a mistrial. For the following reasons, we affirm the convictions and sentences.
STATEMENT OF FACTS
On July 22, 2016, the St. Tammany Parish Sheriff's Office received a report of sexual abuse of a child, C.S. (the victim), and deputies responded to Ochsner Medical Center in Slidell.[1] The case was assigned to Detective Carli Messina. Previous thereto, in 2014, when the victim was three years old, she and her mother, E.B., moved in with E.B.'s mother and stepfather. At the time, defendant, E.B.'s stepbrother, also lived there. According to E.B.'s trial testimony, her mother would routinely babysit the victim while E.B. was at work. E.B. further testified that the victim had a close relationship with defendant, whom she called "Uncle Ottie," "Uncle Scottie," and/or "Uncle Scott." E.B. stated that the victim would sometimes watch television and/or eat snacks in defendant's room and confirmed that they would be in the room alone at times.
Around October of 2015, E.B. observed the victim as she touched herself in an unusual manner. Specifically, E.B. testified that the victim began "tugging on her nonnie" while they were in E.B.'s bedroom.[2] As defendant walked past E.B.'s bedroom, *11 the victim stated, "Uncle Ottie, come play with my nonnie again."[3] In explaining why she did not contact the police at the time, E.B. stated that the victim was very young and that she was not sure if the victim knew what she was saying. However, the victim's statement did influence E.B. to move to a different address in order to get the victim out of the residence with defendant. On July 21, 2016, when the victim had just turned five years old, the victim told E.B. that her nonnie was hurting. When E.B. questioned her in regard to the pain, the victim stated that she had been rubbing her nonnie too hard. E.B. told the victim that she was not supposed to touch her nonnie, and at that point, the victim asked, "[I]f I can't do it, how come my Uncle Ottie can[?]" She added, "Uncle Ottie touches my nonnie." The next morning, E.B. questioned the victim and she confirmed that defendant was the only person who ever touched her nonnie. E.B. contacted the victim's pediatrician, who instructed her to take the victim to Ochsner Medical Center.
On July 27, 2016, the victim was interviewed at the CAC Hope House. During the interview, the victim stated that defendant, "Uncle Scott," pulled down her pants and touched the inside of her "nonnie" with his finger. When asked to describe how that made her feel, the victim stated that it felt like a bear was biting her nonnie, adding that it hurt. The victim further stated that defendant pulled down his clothes and made her touch "his," adding that when she did so "it really gets redder [sic]." She stated that defendant made her touch it with her hand only. The victim further stated that this happened a lot of times and that each time, it occurred in defendant's bedroom. The victim was six years old when the trial took place. When asked if she remembered telling her parents about "a bad touch," the victim stated, "That was a really long time ago." When questioned as to who she previously indicated gave her a "bad touch," the victim gave responses such as "I can't remember," and "I don't know." The victim confirmed that the topic made her feel "scared," and responded "Yes," when asked, "Do you think that man's scary?"
FBI Special Agent Todd Schliem testified that he interviewed defendant after the St. Tammany Parish District Attorney's Office informed him that defendant requested to be interviewed. After Agent Todd informed defendant of his Miranda[4] warnings, he proceeded with the unrecorded interview. Agent Todd questioned defendant regarding his interaction with the victim, and defendant stated that while he had not spent a substantial amount of time alone with the victim, she would sometimes come into his bedroom to watch Netflix. Defendant talked about an incident in which the victim was dancing while watching a movie, became overheated, and began to take off her clothes. Defendant stated that the incident made him feel uncomfortable. Defendant also recalled an occasion when the victim was three or four years old and asked defendant something to the effect of, "Do you want to play with my nonnie?" Defendant stated that he later realized that the victim was referring to her genitals. Defendant confirmed that the victim asked the question in the presence of other individuals.
When defendant was asked if there was any time that he may have touched the *12 victim's genitals, defendant stated that he was unsure or did not recall. He added that he may have inadvertently touched the victim while picking her up to either sit her on his arm or straddle her on his shoulders. Defendant further stated that he was unsure or could not recall whether the victim had ever touched his penis, stating that the victim may have inadvertently done so while hugging his leg. Agent Schlem further testified that defendant noted that the victim would sometimes get under the covers with him and he would rub her back. Defendant denied ever touching the victim in a sexual manner or that she ever touched him in a sexual manner. When defendant testified at trial, he confirmed that he was interviewed by Agent Schlem. He further confirmed that he would lay in bed with the victim at times, stating that this would only happen in E.B.'s bed. He repeatedly denied committing the offenses charged in this case, stating in part, "I did not. I'm afraid that someone did, but it wasn't me."
DENIAL OF MOTIONS FOR A MISTRIAL
In the sole assignment of error, defendant contends that the trial court abused its discretion in denying his motions for a mistrial after a State witness, Detective Messina, twice commented on his post-Miranda silence. Defendant argues that an admonishment would not have been sufficient to cure the prejudice. Defendant further argues that the prosecutor had no reason to ask Detective Messina if she spoke to defendant after he arrived at the St. Tammany Parish jail. He claims that the prosecutor deliberately solicited the testimony in question in an attempt to ascribe a guilty meaning to defendant's post- Miranda silence and to exploit his failure to claim his innocence. Defendant contends that subsequently, on cross-examination, Detective Messina unresponsively commented that defendant did not provide a statement to the investigators. Defendant argues that as an experienced officer, Detective Messina should have known better than to make such a comment at trial. He argues that the detective's comments on his post- Miranda silence were devastating to the defense. Contending that the trial consisted of his word against the child accuser's word and that there was no physical evidence against him, he contends that the comments contributed to the guilty verdicts.[5]
Louisiana Code of Criminal Procedure article 770, with its mandatory mistrial provisions, does not apply to references to a defendant's post-arrest silence by the prosecutor or by witnesses, but only applies to references to a defendant's failure to testify at trial. State v. Kersey , 406 So.2d 555, 560, n.2 (La. 1981) ; State v. Colarte , 96-0670 (La.App. 1 Cir. 12/20/96), 688 So.2d 587, 593, writ denied, *13 97-1015 (La. 10/3/97), 701 So.2d 197. Louisiana Code of Criminal Procedure article 771 is the applicable provision concerning the proper remedy where references are made to a defendant's post-arrest silence.[6] State v. Law , 15-0210 (La.App. 1 Cir. 2/24/16), 189 So.3d 1164, 1176, writ denied, 16-0926 (La. 4/24/17), 220 So.3d 740.
The Louisiana Supreme Court has indicated that under LSA-C.Cr.P. art. 771, when the prosecutor or a witness makes a reference to a defendant's post-arrest silence, the trial court is required, upon the request of the defendant or the State, to promptly admonish the jury. In such cases where the court is satisfied that an admonition is not sufficient to assure a defendant a fair trial, upon motion of the defendant, the court may grant a mistrial. State v. Kersey , 406 So.2d at 560. Upon motion of a defendant, a mistrial shall be ordered, and in a jury case the jury dismissed, when prejudicial conduct in or outside the courtroom makes it impossible for the defendant to obtain a fair trial, or when authorized by Articles 770 or 771. LSA-C.Cr.P. art. 775. Mistrial is a drastic remedy which is warranted only if substantial prejudice results that would deprive the defendant of a fair trial, and the ruling of the trial court will not be disturbed absent an abuse of discretion. Law , 189 So.3d at 1176. The trial judge is given wide discretion to determine whether a fair trial is impossible, or if an admonition is adequate to assure a fair trial. State v. Belgard , 410 So.2d 720, 724 (La. 1982) ; State v. Flowers , 16-0130 (La.App. 1 Cir. 9/19/16), 204 So.3d 271, 284, writ denied, 16-1871 (La. 9/6/17), 224 So.3d 983.
The ruling by the United States Supreme Court in Doyle v. Ohio , 426 U.S. 610, 96 S.Ct. 2240, 49 L.Ed.2d 91 (1976), precludes the State from impeaching a defendant's testimony at trial with evidence that he remained silent immediately after his arrest and after receiving the warnings required by Miranda v. Arizona , 384 U.S. 436, 86 S.Ct. 1602, 16 L.Ed.2d 694 (1966). The decision in Doyle rests on the premise that Miranda warnings render the subsequent silence of a defendant "insolubly ambiguous[,]" and thereby make later use of that silence to impeach his or her exculpatory testimony at trial fundamentally unfair. Doyle , 426 U.S. at 617-18, 96 S.Ct. at 2244-45.
A brief reference to post-arrest silence does not mandate a mistrial or reversal where the trial as a whole was fairly conducted, the proof of guilt is strong, and the State made no use of the silence for impeachment. Further, the State is allowed reference to the defendant's post-arrest silence when the line of questioning is an attempt to summarize the extent of the police investigation and is not designed to exploit the defendant's failure to claim his innocence after his arrest in an effort to impeach his testimony or attack his defense. Law , 189 So.3d at 1177-78.
*14 Herein, on direct examination Detective Messina testified that after a warrant for defendant's arrest was issued, defendant had to be extradited to St. Tammany Parish from Tennessee, where he relocated to live with his mother. The following colloquy then took place:
Q. What, if anything, did you do when you found out that Scott Barr had arrived back in St. Tammany Parish Jail?
A. So the first thing I did was, obviously, go in and book him on the warrant that we had for him. After the booking process, myself and another detective, Detective Hugh Davis, asked Mr. Barr if he'd like to accompany us back to the office to discuss the case.
At that time, he indicated he did wish to accompany us back to the office, which is about a three minute drive from the jail.
Q. So you go in to speak with the defendant, and before speaking with him, did you provide his Miranda warnings?
A. Yes, ma'am. I read him his Miranda rights. He signed the form indicating that he understood. Then I read him his waiver of rights where he then indicated that he did not wish to provide any type of statement.
After the above line of questioning, defense counsel approached the bench and moved for a mistrial. The trial court noted that a mistrial would not be mandatory under the Code of Criminal Procedure and asked defense counsel if he wanted an admonition. Defense counsel declined the offer for an admonition. As defendant notes, the motion was re-urged when, on cross-examination, Detective Messina was asked whether the victim's mother ever stated that defendant owed her money and replied, "No, sir, and Mr. Barr didn't provide a statement, so I had no knowledge of anything." Defense counsel confirmed that he was again declining an admonition, and the trial court noted that its ruling denying the motion would stand, but that it would warn the witness and the State against any further such remarks regarding defendant's post-arrest silence.
In his appeal brief herein, defendant cites State v. Patterson , 12-0464 (La. 7/2/12), 92 So.3d 338 (per curiam), wherein the defendant was charged with aggravated battery, and a jury found him guilty of second degree battery. It was a case that "essentially pitted the victim's word against defendant's with little or no corroboration on either side." Id. The Louisiana Supreme Court agreed with the court of appeal that in its entirety, the prosecutor's cross-examination of the defendant, while used for impeachment, violated Doyle by focusing on his post-arrest as well as his pre-arrest failure to provide the police with the exculpatory account he offered jurors at trial. However, the court of appeal affirmed the defendant's conviction and sentence. The supreme court reversed, finding that the Doyle violation in Patterson was not harmless, because it did not find the defendant's exculpatory account so implausible that the State carried its burden of proving that the Doyle violation did not contribute to the jury's verdict.
We find that the instant case is distinguishable from Patterson . Herein, the State, in cross-examining defendant, did not stress defendant's invocation of his right to remain silent, did not inquire about defendant's failure to respond to police questioning, and did not ask if defendant provided a statement. There is no indication in the record that the State used defendant's silence, at the time of arrest and after receiving Miranda warnings, for impeachment. Compare Doyle , 426 U.S. at 617-19, 96 S.Ct. at 2244-45. The detective's brief references to the post-arrest silence of defendant did not result in such substantial *15 prejudice to him that he was deprived of any reasonable expectation of a fair trial. At most, the defense would have been entitled to an admonition, but the defense declined an admonition. Article 771 mandates a request for an admonishment. State v. Pooler , 96-1794 (La.App. 1 Cir. 5/9/97), 696 So.2d 22, 48, writ denied, 97-1470 (La. 11/14/97), 703 So.2d 1288. Herein, there was no abuse of discretion in the denial of the motion for a mistrial based on references to post-arrest silence. Considering the record as a whole, we find that the references at issue were minimal, and the trial as a whole was conducted fairly. Considering the foregoing, the sole assignment of error is without merit.
CONCLUSION
For the foregoing reasons, defendant's assignment of error lacks merit. Accordingly, defendant's convictions and sentences are affirmed.
CONVICTIONS AND SENTENCES AFFIRMED.

The date of birth of the victim, C.S., is June 5, 2011, and the offense was alleged to have been committed between June 5, 2015, and July 22, 2016, when the victim was between four and five years old. Herein, we reference the child victim and her immediate family members by initials only. See LSA-R.S. 46:1844W.

E.B. testified that "nonnie" was the word that she taught the victim to use when referencing her vaginal area.

The victim's stepfather, B.B., and a family friend who was living in the residence at the time, Russell Johnson, testified that they were present on this occasion, and testified consistent with E.B., as to the victim's statement.

Miranda v. Arizona , 384 U.S. 436, 86 S.Ct. 1602, 16 L.Ed.2d 694 (1966).

Defendant argues that DNA evidence pointed to B.B. as the offender. Doris Hoffpauir, an expert in DNA analysis, testified the sperm fraction from a stain (located in the right-hip, non-crotch area) on the panties worn by the victim at the time of the disclosure produced a profile consistent with B.B.'s DNA profile. The epithelial fraction from the stain produced a profile consistent with a mixture of three contributors, consisting of one male, likely B.B., and two biologically related females, though statistical interpretation could not be performed. As Hoffpauir testified, the stain was invisible to the naked eye and consisted of transferred DNA, which could have been transferred during laundering. Hoffpauir further testified that generally in sexual abuse cases, semen-stained underwear would consist of multiple stains, including the crotch area, and smearing. E.B. testified that she routinely mixed the victim's clothing with other laundry. She retrieved the panties from a pile of laundry after being told to gather the items that the victim was wearing at the time of her disclosure. The victim did not make any accusations against B.B., only defendant.

Louisiana Code of Criminal Procedure article 771 provides, in pertinent part:
In the following cases, upon the request of the defendant or the state, the court shall promptly admonish the jury to disregard a remark or comment made during the trial, or in argument within the hearing of the jury, when the remark is irrelevant or immaterial and of such a nature that it might create prejudice against the defendant, or the state, in the mind of the jury:
* * *
(2) When the remark or comment is made by a witness or person other than the judge, district attorney, or a court official, regardless of whether the remark or comment is within the scope of Article 770.
In such cases, on motion of the defendant, the court may grant a mistrial if it is satisfied that an admonition is not sufficient to assure the defendant a fair trial.