## NOT DESIGNATED FOR PUBLICATION

## STATE OF LOUISIANA

## COURT OF APPEAL

## FIRST CIRCUIT

## 2022 KA 1178

## STATE OF LOUISIANA

## VERSUS

## TORRANCE VERDIN

Judgment Rendered: **SEP 07 2023**

\*\*\*\*\*\*\*\*\*\*\*\*\*

Appealed from the Thirty-Second Judicial District Court
Parish of Terrebonne – State of Louisiana
Docket Number 809862 – Division C
The Honorable Juan W. Pickett, Presiding Judge

\*\*\*\*\*\*\*\*\*\*\*\*\*

<table>
<tr><td>Sherry Watters<br>New Orleans, Louisiana</td><td>COUNSEL FOR APPELLANT,<br>Defendant – Torrance Verdin</td></tr>
<tr><td>Joseph L. Waitz, Jr.<br>District Attorney<br>Ellen Daigle Doskey<br>James Christopher Erny<br>Assistant District Attorneys<br>Houma, Louisiana</td><td>COUNSEL FOR APPELLEE,<br>State of Louisiana</td></tr>
</table>

\*\*\*\*\*\*\*\*\*\*\*\*\*

**BEFORE: WELCH, PENZATO, AND LANIER, JJ.**

JCW
Welch J. dissents and assigns reasons

**PENZATO, J.**

The defendant, Torrance Verdin, was charged by grand jury indictment with second degree murder, a violation of La. R.S. 14:30.1 (count 1), and attempted second degree murder, a violation of La. R.S. 14:30.1 and La. R.S. 14:27 (count 2).[1] He pled not guilty and, following a jury trial, was found guilty as charged on both counts by unanimous verdicts. The defendant filed motions for new trial and postverdict judgment of acquittal, which were denied. For the second degree murder conviction, the trial court sentenced the defendant to life imprisonment at hard labor without the benefit of probation or suspension of sentence, but with the benefit of parole. For the attempted second degree murder conviction, the trial court sentenced the defendant to fifty years imprisonment at hard labor without the benefit of parole, probation or suspension of sentence. The defendant filed a motion to reconsider sentence, which was denied. The defendant now appeals, designating five assignments of error. We affirm the conviction and sentence on count one. We affirm the conviction and amend the sentence on count two to reflect that the sentence is to be served with the benefit of parole, affirm the sentence as amended, and remand the matter to the trial court with instructions.

## FACTS

On December 24, 2019, Courtney Carter and Jason Boyd (the victims) went to the Southland Mall in Houma. They left the mall around 11:15 a.m. in a white Dodge Charger driven by Carter, with Boyd in the front passenger seat. While the vehicle was stopped at a red light at the intersection of St. Louis Canal Road and Hollywood Road, Boyd heard gunshots, looked to his right, and saw two guns pointing out of the back-seat window of a white car. Carter, Boyd, and the Charger were struck by the gunfire. Carter was more seriously injured, so Boyd moved him

---

[1] Tyler Devante Payne and Desmond Devonte Verdin were co-defendants who were not tried in the instant case.

2

to the back seat and drove them to Terrebonne General Hospital. Boyd survived his injuries, but Carter died at the hospital.

At the hospital, Boyd told Detective Ryan Trosclair of the Terrebonne Parish Sheriff's Office that there were two shooters in the back seat. He also indicated that he and Carter were involved in an altercation at the mall, and he believed the people in the car were the same people involved in the altercation, but he did not know who they were and was not able to identify them. This information led Detective Trosclair to gather surveillance footage from the mall. Detective Mitchell Legendre of the Terrebonne Parish Sheriff's Office reviewed the mall video footage and observed the victims meeting up with a group of guys in the mall and exchanging words. He was able to identify the defendant and Desmond Verdin.

Through the investigation, officers learned that a white Chevrolet Cruze may have been involved in the shooting.[2] According to Detective Trosclair's testimony, which was supported by the video footage, the Cruze arrived at the mall around 10:30 a.m., and four males, identified as the defendant, Desmond, Tyler Payne, and Lorenzo Barrow, got out of the vehicle and entered the mall. The victims arrived at the mall shortly thereafter.

Video footage showed that around 11:15 a.m., the defendant exited the mall. He went out of view of the camera, in the direction of Dillard's, and was not seen on camera again. According to Detective Trosclair, this was a "blind spot" in the outside parking lot area not picked up by any camera. The victims also left the mall around this time, near the same exit where the defendant was last seen.

Video footage showed Desmond and Payne leaving the mall from JCPenney

---

[2] It is not clear from the record how the white Cruze became a suspect vehicle. At trial, Detective Trosclair stated: "I want to say that was - it was th[e] day [of the shooting] that we were able to get the information. I don't remember how we got it, the information on the Cruze - the white Cruze. So, we went out looking for that vehicle[.]"

shortly before 11:15, and getting into the Cruze, with Payne driving. Then, according to Detective Trosclair, Payne drove in front of Dillard's where the defendant would have been standing. At about 11:19 a.m., the Charger exited the mall parking lot onto Bayou Gardens Boulevard. Seconds later, the Cruze can be seen leaving the parking lot in the same direction. Additional surveillance footage showed Carter driving toward the intersection of St. Louis Canal Road and Hollywood Road, with the Cruze about 30 to 40 seconds behind him and travelling the same route. The shooting occurred shortly thereafter.

Keoka Carter, Carter's sister, was shown the mall video footage of the altercation and identified Desmond. According to Keoka, in 2005, Carter shot Desmond's father. Carter plead guilty, and served 11 years in prison. At trial, the parties stipulated that if Adlena Verdin was called as a witness, she would testify that she was the mother of the defendant and Desmond; that the defendant and Desmond did not have the same father; and that she was not Barrow's mother, but he shared the same biological father as Desmond.

The defendant did not testify at trial.

## ASSIGNMENT OF ERROR NO. 1

In his first assignment of error, the defendant argues that the evidence was insufficient to support the convictions. Specifically, the defendant contends that his identity as one of the shooters was not proven by the State beyond a reasonable doubt.[3] In conjunction with his argument that the evidence against him was insufficient, the defendant argues the trial court incorrectly allowed the State to: (1) interject a false motive; (2) rely on opinion testimony of an officer; and (3) exploit the defendant's exercise of his Fifth Amendment rights.

---

[3] The defendant also argues that there is insufficient evidence to support the State's alternative theory that the defendant was a principal to the shooting. We note that the jury was charged on the law of principals. However, based on our finding that there is sufficient evidence to support the guilty verdicts, we pretermit discussion of this argument.

4

In cases such as this one, where the defendant raises issues on appeal both as to the sufficiency of the evidence and as to one or more trial errors, the reviewing court should preliminarily determine the sufficiency of the evidence, before discussing the other issues raised on appeal. When the entirety of the evidence, both admissible and inadmissible, is sufficient to support the conviction, the accused is not entitled to an acquittal, and the reviewing court must review the assignments of error to determine whether the accused is entitled to a new trial. *State v. Hearold*, 603 So.2d 731, 734 (La. 1992); *State v. Eason*, 2019-0614 (La. App. 1st Cir. 12/27/19), 293 So.3d 61, 69. If the reviewing court determines there has been trial error (which was not harmless) in cases in which the entirety of the evidence was sufficient to support the conviction, then the accused must receive a new trial, but is not entitled to an acquittal even though the admissible evidence, considered alone, was insufficient. *Hearold*, 603 So.2d at 734; *State v. Calloway*, 2018-1396 (La. App. 1st Cir. 4/12/19), 276 So.3d 133, 141, writ denied, 2019-00869 (La. 1/20/21), 308 So.3d 1164.

A conviction based on insufficient evidence cannot stand as it violates Due Process. See U.S. Const. amend. XIV; La. Const. art. I, § 2. The standard of review for the sufficiency of the evidence to uphold a conviction is whether, viewing the evidence in the light most favorable to the prosecution, any rational trier of fact could have found the essential elements of the crime beyond a reasonable doubt. *Jackson v. Virginia*, 443 U.S. 307, 319, 99 S.Ct. 2781, 2789, 61 L.Ed.2d 560 (1979). See La. Code Crim. P. art. 821(B); *State v. Ordodi*, 2006-0207 (La. 11/29/06), 946 So.2d 654, 660. The *Jackson* standard of review, incorporated in Article 821, is an objective standard for testing the overall evidence, both direct and circumstantial, for reasonable doubt. When analyzing circumstantial evidence, La. R.S. 15:438 provides that the factfinder must be satisfied the overall evidence excludes every reasonable hypothesis of innocence.

5

See *State v. Patorno*, 2001-2585 (La. App. 1st Cir. 6/21/02), 822 So.2d 141, 144.

On appeal, the reviewing court does not determine whether another possible hypothesis suggested by a defendant could afford an exculpatory explanation of the events. *State v. Mitchell*, 1999-3342 (La. 10/17/00), 772 So.2d 78, 83. Rather, the court must evaluate the evidence in a light most favorable to the state and determine whether the possible alternative hypothesis is sufficiently reasonable that a rational juror could not have found proof of guilt beyond a reasonable doubt. *Id.*

In order to prove that the defendant was guilty of second degree murder and attempted second degree murder, the State had to prove the elements of La. R.S. 14:30.1 and 14:27. The State presented two theories of second degree murder that are applicable herein: (1) the killing of a human being when the offender has a specific intent to kill or to inflict great bodily harm, La. R.S. 14:30.1(A)(1); and (2) the killing of a human being when the offender is engaged in the perpetration or attempted perpetration of assault by drive-by shooting, even though he has no intent to kill or to inflict great bodily harm. La. R.S. 14:30.1(A)(2). A person is guilty of an attempt to commit an offense when he has a specific intent to commit a crime and "does or omits an act for the purpose of and tending directly toward the accomplishing of his object." La. R.S. 14:27. To sustain a conviction for attempted second degree murder, the State must prove the defendant intended to kill the victim and committed an overt act tending toward the accomplishment of the victim's death. *State v. Bishop*, 2001-2548 (La. 1/14/03), 835 So.2d 434, 437. Attempted second degree murder requires specific intent to kill; specific intent to inflict great bodily harm is insufficient. *Id.*

Though intent is a question of fact, it need not be proven as a fact, and may be inferred from the circumstances of the transaction. Specific intent may be proven by direct evidence, such as statements by a defendant, or by inference from

6

circumstantial evidence, such as a defendant's actions or facts depicting the circumstances. Specific intent is an ultimate legal conclusion to be resolved by the factfinder. *State v. Coleman*, 2017-1045 (La. App. 1st Cir. 4/13/18), 249 So.3d 872, 877, writ denied, 2018-0830 (La. 2/18/19), 263 So.3d 1155. Specific intent to kill may be inferred from a defendant's act of pointing a gun and firing at a person. *State v. Welch*, 2019-0826 (La. App. 1st Cir. 2/21/20), 297 So.3d 23, 27, writ denied, 2020-00554 (La. 9/29/20), 301 So.3d 1193.

The defendant argues that his identity as one of the perpetrators was not proven beyond a reasonable doubt by the State as there was a lack of forensic evidence, eyewitness identification, or admission of guilt that supported the State's theory. He argues that while ballistic evidence and Boyd's testimony revealed that two guns were used in the shooting, the evidence is insufficient to prove that there were two separate shooters in the vehicle, much less that he was one of the shooters. The defendant further argues that the likelihood of misidentification violated his due process rights. The defendant points out that he was never seen getting into the Cruze that followed the Charger and argues that the State's theory that he was one of the people in the car is based solely on speculation and conjecture.

Despite the defendant's assertions, we find that based on the evidence introduced and adduced at trial, and when viewed in the light most favorable to the State, a juror could have rationally concluded that the defendant was a shooter in the drive-by shooting of Carter and Boyd. To meet its burden of proof, the State introduced evidence from various witnesses, including firearms examinations, forensics, and ballistics expert Michelle Cazes Olinde, to show that there were two types of bullets recovered in the course of the investigation, a .40 caliber bullet and a 9-millimeter casing, indicating two different weapons were used.

Boyd, the surviving victim of the shooting, testified that, while he was

7

unable to identify the shooters, he saw two shooters and two guns pointing out of the back-driver's side window of the shooters' vehicle. This testimony was consistent with both of his interviews with Detective Trosclair, which were played at trial, and in which Boyd indicated there were two people in the back seat and no front-seat passenger. During one of these interviews, Boyd was asked if he could tell whether it was two people shooting or one person shooting two guns. Boyd responded that "it was two people because . . . he had his hands out the window like this[.]" Detective Trosclair interrupted at this moment and stated, "So he had two [inaudible], two hands on the gun, ok[.]"

For trial purposes, Detective Trosclair compiled the most pertinent segments from the mall video footage and, while each segment was played for the jury, explained what was being seen in the video. He testified that there were "probably" 30 different cameras inside the mall, each filming from a different angle. Detective Trosclair testified that he watched "hours and hours of video" from Christmas Eve, "every angle, detail for detail."

Exterior mall video footage showed that at approximately 10:36 a.m., the Cruze arrived at the mall, parked near JCPenney, and the defendant, Desmond, Payne, and Barrow walked along the sidewalk adjacent to the mall past JCPenney. Interior mall video footage showed the four men enter an interior area of the mall near JCPenney approximately three minutes later.

At approximately 10:38 a.m., exterior mall video footage showed the Charger pulled into the parking lot at the front entrance to the mall, and the victims entered the mall shortly thereafter. Boyd testified that when he and Carter arrived at the mall they went to Victoria's Secret. According to Boyd, Carter was approached by "three guys" and they "passed words." Boyd testified that he did not know any of the men who approached Carter. Boyd further testified that after they "passed words," they "came out of the store, and into...the middle of the mall

8

– they was talking still." After that, according to Boyd, the men "just walked off." While Boyd testified that he did not remember what kind of words were passed in Victoria's Secret, he was "certain it was – ...a hostile word....[Carter] said something and then they said something. At trial, Boyd indicated that he and Carter did not discuss this confrontation, and he did not know what was said between the groups. According to Boyd, after this incident, he and Carter went to Footlocker then left the mall.

Boyd's testimony was corroborated by the mall video footage, which showed that at 10:56 a.m., the defendant, Desmond, and Barrow entered an interior courtyard area of the mall (the Dillard's court area), followed by the victims. Carter and Barrow are seen exchanging words.[4] Following the exchange, which lasted around twenty seconds, the defendant, Desmond, and Barrow walked off.

After the exchange between the groups, the mall video footage showed Payne rejoined the defendant, Desmond, and Barrow, and all four men walked into what Detective Trosclair identified as JCPenney. Two minutes later, the defendant and Desmond exited the store and walked through the Dillard's court area. At 11:06 a.m., the defendant and Desmond returned to the area in front of JCPenney and sat on a bench outside of the store's entrance, facing away from the store. After three minutes, Desmond re-entered JCPenney, and the defendant walked further into the mall. At no time did the mall video footage show any other individual join the defendant, Desmond, Payne, and Barrow.

Exterior mall video footage next showed the defendant exiting the front entrance to the mall at 11:12 a.m., and walking to the right. He returned into the view of the camera less than a minute later and walked around near the entrance while on his cell phone. The defendant re-entered the mall, then exited again,

---

[4] The video footage does not contain audio.

looked around, and walked to the right, out of the camera's view. He re-entered the mall, and approximately a minute and a half later, the victims exited the mall from the front entrance and turned right.

Exterior mall video footage of the sidewalk adjacent to the front entrance to the mall showed the victims walking on the sidewalk towards Dillard's. At 11:15 a.m., the defendant is seen exiting the mall from H & M,[5] which is right next to the mall's front entrance, turning right, and walking along the sidewalk, while on his cell phone. The victims are seen several feet behind the defendant. At approximately 11:16 a.m., the defendant walked out of the view of the camera. Detective Trosclair testified that the area where the defendant went out of the view of the camera was a blind spot on the side of Dillard's, and no other exterior cameras pointed toward that area. As the defendant walked out of the camera's view at 11:16 a.m., the victims are seen leaving the sidewalk and walking across the parking lot to the Charger. The Charger is seen leaving the parking spot approximately two minutes later.

Exterior mall video footage of JCPenney showed that at 11:12 a.m., Desmond and Payne exited the mall from JCPenney and got into the Cruze. Payne got into the driver's seat, while Desmond entered the passenger side of the vehicle.[6] At 11:13 a.m., the mall video footage showed the Cruze exited the parking space and drove along the sidewalk adjacent to the mall.

At 11:17 a.m. the Cruze is seen driving in the parking lot near the front entrance to the mall several rows from where the Charger was parked, in the area

---

[5] Video footage from inside H & M showed the defendant exiting the mall from H & M and turning right onto the sidewalk.

[6] From the video footage, it is unclear whether Desmond entered the front seat or the back seat of the vehicle.

where the defendant had last been seen walking out of view.[7] Detective Trosclair testified that the camera angle of this exterior mall video footage was positioned further towards Dillard's from the camera angle from which the Charger could be seen. He further noted that this camera angle did not show the sidewalk. According to Detective Trosclair, based on his review of the mall video footage, the Cruze was not seen from the time it left the parking lot outside of JCPenney until this camera angle, suggesting that the Cruze drove close to the building, outside of the view of the cameras. The Cruze is seen driving up and down the parking rows, leaving the view of the camera on two occasions as it neared the sidewalk adjacent to the mall. Detective Trosclair testified that, based on the video footage, he calculated that the Cruze passed the area where the defendant went out of the camera's view within one minute of the defendant's last appearance on the video.

At around 11:18 a.m., the Charger is seen driving across the mall parking lot towards the Bayou Gardens Boulevard mall exit, and shortly thereafter, the Cruze followed in the same direction. The Charger is next seen at 11:19 a.m., driving down Bayou Gardens Boulevard towards St. Louis Canal Road, with the Cruze exiting the mall parking lot and turning onto Bayou Gardens Boulevard to travel in the same direction approximately twenty-five seconds later. From this point, the State tracked both vehicles using surveillance footage from nearby businesses. At approximately 11:22 a.m., the Charger is seen on Bayou Gardens Boulevard, followed by the Cruze approximately thirty seconds later. The Charger is seen approaching the intersection of Bayou Gardens Boulevard and St. Louis Canal Road, then is seen travelling on St. Louis Canal Road, followed by the Cruze.

---

[7] Detective Trosclair indicated that he knew this was the same vehicle that Desmond and Payne were seen entering based on the color of the license plate, which was not a Louisiana license plate.

Boyd testified that after leaving the mall, he and Carter were going back to the east side of Houma, where Carter lived. According to Boyd, they left the mall and travelled down Bayou Gardens Boulevard to a "back road ... [o]ut behind the mall," where they turned right at a red light. The video confirmed that this was St. Louis Canal Road. Boyd testified that they got to a red light at the end of that road, and when they came to a stop, he and Carter were shot by two people from the back of a white car. According to Boyd, after the shooting, the white car turned right and he and Carter turned left. Lieutenant Jason Kibodeaux of the Terrebonne Parish Sheriff's Office testified that the shooting took place at St. Louis Canal Road and Hollywood Drive. Detective Trosclair testified that the Cruze was spotted on surveillance video at 11:25 a.m. travelling on Hollywood Drive and turning right onto Alma Street.

Finally, the jury was shown exterior mall video footage of Barrow exiting the mall in the same area the Cruze was parked at 11:41 a.m., after the shooting occurred. He walked along the sidewalk adjacent to JCPenney, turned back, and appeared to re-enter the mall a couple of minutes later. Detective Trosclair testified that he never saw the defendant in any other video footage after he saw the defendant walk out of the camera's view near Dillard's. Detective Trosclair further testified that he spoke to Mara Jackson, Desmond's girlfriend, who indicated that she received a telephone call from Desmond on December 24, 2019, and based upon that phone call she went to pick up Barrow from the mall. Detective Trosclair was asked whether Jackson indicated that she was asked to pick up the defendant, to which he replied, "No."

The State's theory of the case was that when the defendant and Desmond exited JCPenney and walked through the mall, then sat on the bench outside of JCPenney, they were searching for the victims. The State argued that the defendant was acting as "the scout," and must have passed the victims when he re-entered the

12

front entrance of the mall approximately a minute before the victims exited the mall, before he circled back through H & M to exit the mall right in front of the victims. Payne and Desmond left the mall and got into the Cruze, with Payne driving, at 11:12 a.m. The State contended that after driving around the mall parking lot and towards the direction the defendant was last seen walking, Payne picked up the defendant sometime after he disappeared from the mall's video footage after 11:15 a.m., and before the Cruze reappeared on the video footage shortly before 11:17 a.m.

In order to support its theory that the defendant was the second shooter, the State relied on the forensic and ballistic evidence that indicated that two guns were used in the commission of the crime and Boyd's testimony that there were two shooters in the back seat of the car. The State further contended that Payne was clearly not one of the shooters because he was seen getting into the driver's seat of the Cruze; Barrow could not have been one of the shooters because he was seen at the mall 10 minutes after the shooting; there was no time to pick up another third person; and the defendant was never seen on any other video, anywhere else, after he walked out of the camera's view in almost the exact area the Cruze appeared 41 seconds later.

After a thorough review of the record, we find that the evidence supports the guilty verdicts. We are convinced that viewing the evidence in the light most favorable to the State, a rational trier of fact could have found beyond a reasonable doubt, and to the exclusion of every reasonable hypothesis of innocence, that the defendant was guilty of the second degree murder of Carter and the attempted second degree murder of Boyd. See State v. Calloway, 2007-2306 (La. 1/21/09), 1 So.3d 417, 418 (per curiam).

The State presented evidence that the defendant, Payne, Desmond, and Barrow all arrived together at the mall in the Cruze. The mall video reflected that

13

following the encounter in the Dillard's court area, the defendant and his half-brother, Desmond, separated from Payne and Barrow and returned to the Dillard's court area, and later relocated to an area in front of JCPenney. The defendant is later seen going in and out the mall in the area of the front entrance where the victims exited. At approximately the same time as the victims exited the mall, Payne and Desmond are seen entering the Cruze and travelling to the area where the victims' car was parked and the defendant was last seen. The State further presented evidence, which was clearly accepted by the jury, that two guns were used in the perpetration of the crime, both of which were pointed out of the back seat, which indicated that three people were in the vehicle. The State also presented evidence, which was clearly accepted by the jury, that the only reasonable conclusion was that the defendant was the second shooter, based on the fact that Payne was seen getting into the driver's side of the vehicle, Desmond entered the passenger side of the vehicle, Barrow was still at the mall at the time of the shooting, and the Cruze passed by the defendant's last known whereabouts within one minute of the defendant's last appearance on the video footage. The defendant is never seen leaving the mall in any other manner. Further, there was no evidence that a fifth person ever joined the defendant, Payne, Desmond, and Barrow at the mall.

An appellate court errs by substituting its appreciation of the evidence and credibility of witnesses for that of the fact finder and thereby overturning a verdict on the basis of an exculpatory hypothesis of innocence presented to, and rationally rejected by, the jury. *Calloway*, 1 So.3d at 418.

*Allegation of Altercation and Revenge Motive*

In this same assignment of error, the defendant argues that the evidence failed to support the State's claim that his motive for shooting Carter was the altercation at the mall and for revenge against Carter for killing Desmond's father

14

years earlier. The defendant argues that if the shooting was to avenge Carter's murder of Gerald Jones, Desmond and Barrow would have been the ones seeking retribution. The defendant further argues that the minor exchange at the mall was no reason for the shooting. He argues that for lack of evidence of intent, his convictions should be vacated.

Under the *Jackson* standard of review, "the relevant question is whether, after viewing the evidence in the light most favorable to the prosecution, *any* rational trier of fact could have found *the essential elements of the crime* beyond a reasonable doubt." *Jackson*, 443 U.S. at 319, 99 S.Ct. at 2789 (second emphasis added). In connection with the charge of second degree murder, the State was required to prove the defendant killed Carter with the specific intent to kill or to inflict great bodily harm, or when engaged in the perpetration of assault by drive-by shooting. La. R.S. 14:30.1(A)(1), (2). In connection with the charge of attempted second degree murder, the State had to prove the defendant intended to kill Boyd and committed an overt act tending toward the accomplishment of the victim's death. See *Bishop*, 835 So.2d at 437. Motive is not an essential element of second degree murder or attempted second degree murder, and a jury need not find it proved beyond a reasonable doubt. See *State v. Mire*, 2014-2295 (La. 1/27/16), 269 So.3d 698, 702 (per curiam).

This argument is without merit.

*Opinion Testimony of Officers*

The defendant next objects to the detectives' identification of him in the mall video footage and their narration of the video footage. He further argues that this error was compounded when the jury was denied its request to view the videos during deliberations.

As noted above, Detective Legendre testified that he recognized the defendant and Desmond in the mall video footage. The defendant did not object to

15

Detective Legendre's identification.

On appeal, the defendant argues that identification of the perpetrator was an ultimate fact for the jury only to decide. He contends that Detective Legendre's identification of the defendant, without evidence of direct knowledge, was an improper use of opinion testimony by a lay witness, and Detective Legendre was not qualified as an expert to give his opinion as to the identification of the defendant in the video.

Prior to trial, the defendant filed a motion in limine, requesting, among other things, that the trial court instruct the State not to bring before the jury any reference to prior bad acts the defendant was alleged to have committed. Prior to opening statements, the trial court addressed the defendant's motion. At that time, counsel for the defendant expressed concern that the State would ask Detective Legendre to identify the parties in the mall video footage and Detective Legendre would indicate that he knew the defendant and Desmond because of prior investigations. The trial court ruled that the detective could identify the defendant, based on prior knowledge of him, but would not be allowed to get into the nature of prior investigations.

There is no requirement that a police officer be qualified as an expert to identify a person in a video. The defendant sought a ruling from the trial court prohibiting Detective Legendre from explaining how he was able to recognize the defendant in the mall video footage. Moreover, the jurors were able to view the mall video footage, to view the defendant in court, and to determine the credibility of all testimony and evidence. See *State v. Berniard*, 2014-0341 (La. App. 4th Cir. 3/4/15), 163 So.3d 71, 82, writ denied, 2015-0678 (La. 2/26/16), 187 So. 3d 468.

The defendant next complains that his objections were overruled as to Detective Trosclair's testimony during the playing of the mall video footage. As noted above, Detective Trosclair compiled segments from "hours and hours" of

16

mall video footage taken from approximately 30 different cameras, at different angles, from around the mall. The defendant objected to Detective Trosclair's testimony, arguing that the videos were clear enough that the jurors could see for themselves what was going on, without the need for Detective Trosclair to tell the jury what he saw. The trial court overruled the objection, indicating that with so many people in the mall, Detective Trosclair could direct the jury's attention to what was important in the mall video footage. We find no error in the trial court's ruling. As noted above, the jurors were able to view the mall video footage, and were allowed to approach the screen for a closer look. Thus, they were able to assess the credibility of Detective Trosclair's testimony regarding the mall video footage.

After the jury retired for deliberations, it requested to see certain portions of the mall video footage. The request was denied, and the jury was told it would have to rely on its memory. The defendant did not object to this ruling. Under La. Code Crim. P. art. 841(A), an "irregularity or error cannot be availed of after verdict unless it was objected to at the time of occurrence." See *State v. Johnson*, 2000-0680 (La. App. 1st Cir. 12/22/00), 775 So.2d 670, 680, writ denied, 2002-1368 (La. 5/30/03), 845 So.2d 1066. This is known as the contemporaneous objection rule and provides the trial court notice and the opportunity to cure an alleged irregularity or error and prevents a party from gambling for a favorable outcome then appealing when the error could have been addressed by an objection. *State v. Lanclos*, 2007-0082 (La. 4/8/08), 980 So.2d 643, 648. The failure to make a contemporaneous objection prior to verdict waives the alleged error or

17

irregularity and precludes the defendant from raising it on appeal.[8] Moreover, the defendant has failed to show he suffered any prejudice from the trial court's ruling because the jury had the opportunity to view the mall video footage during the trial. See State v. Cespedes, 2017-1087 (La. App. 1st Cir. 12/29/17), 241 So.3d 342, 349, writ denied, 2018-0263 (La. 12/17/18), 259 So.3d 340.

This argument is without merit.

*Fifth Amendment Claims*

Defendant's final argument in his first assignment of error is that the State impermissibly shifted the burden of proof to the defendant in violation of his rights pursuant to the Fifth Amendment of the United States Constitution. Specifically, he complains that Detective Trosclair and the prosecutor commented on the defendant's failure to make a statement and to present a defense by calling his family to prove he was not at the mall or in the Cruze.

Detective Brian Falgout of the Terrebonne Parish Sheriff's Office testified at trial regarding a car chase involving a Honda that occurred one week after the shooting, on New Year's Eve.[9] According to Detective Falgout, he was on patrol when dispatchers advised over the radio that the subjects involved in the shooting were in the Honda. Detective Falgout testified that the Honda crashed into a residence, and the driver and passenger exited the vehicle and fled on foot. He further testified that, based on information received from dispatch, he searched for a white vehicle that was in the neighborhood to pick up the two suspects that had fled from the Honda. Detective Falgout located the white vehicle, which was

---

[8] If an alleged error is so significant that it violates a fundamental right, then, to preserve the requirements of due process, the error is reviewable on appeal even absent a contemporaneous objection. See La. Code Crim. P. art. 920(2); State v. Arvie, 505 So.2d 44, 47 (La. 1987); State v. Thompkins, 2018-1032 (La. App. 1st Cir. 2/27/19), 273 So.3d 346, 350 n.4, writ denied, 2019-00666 (La. 9/17/19), 278 So.3d 973. To meet the exception to the contemporaneous objection requirement, the error must cast substantial doubt on the reliability of the fact-finding process. Thompkins, 273 So.3d at 350 n.4. That standard is not met here.

[9] Detective Falgout was a shift lieutenant in 2019, but was promoted to detective prior to trial.

18

being driven by a female. A juvenile subject was also in the vehicle and was detained. Detective Falgout later learned that the juvenile in the vehicle was the defendant.

During direct examination, Detective Trosclair testified that after the defendant was detained following the New Year's Eve car chase, he was transported to the sheriff's office to be questioned. The following exchange took place:

Q: …[W]hat else did you do that night?

A: We got in touch with family members for [the defendant], because he was a juvenile.

Q: Okay.

A: And – but they decided not to talk.

Defense counsel objected to the statement and requested a mistrial. The trial court denied the mistrial, finding that the prosecutor did not intentionally solicit Detective Trosclair's response.

Louisiana Code of Criminal Procedure article 770, with its mandatory mistrial provisions, does not apply to references to a defendant's post-arrest silence by the prosecutor or by witnesses, but only applies to references to a defendant's failure to testify at trial. *State v. Kersey*, 406 So.2d 555, 560 n.2 (La. 1981); *State v. Barr*, 2018-1111 (La. App. 1st Cir. 2/28/19), 275 So.3d 9, 12, writ denied, 2019-00706 (La. 10/15/19), 280 So.3d 599. Louisiana Code of Criminal Procedure article 771 governs the proper remedy where references are made to a defendant's

19

post-arrest silence.[10] The Louisiana Supreme Court has indicated that under La. Code Crim. P. art. 771, when the prosecutor or a witness makes a reference to a defendant's post-arrest silence, the trial court is required, upon the request of the defendant or the State, to promptly admonish the jury. In such cases where the court finds that an admonition is not sufficient to assure a defendant a fair trial, upon motion of the defendant, the court may grant a mistrial. *Barr*, 275 So.3d at 13. Mistrial is a drastic remedy which is warranted only if substantial prejudice results that would deprive the defendant of a fair trial, and the ruling of the trial court will not be disturbed absent an abuse of discretion. The trial court is given wide discretion to determine whether a fair trial is impossible, or if an admonition is adequate to assure a fair trial. *Id.*

We find that the trial court did not abuse its discretion. A brief reference to post-arrest silence does not mandate a mistrial or reversal where the trial as a whole was fairly conducted, the proof of guilt is strong, and the State made no use of the silence for impeachment. *State v. Law*, 2015-0210 (La. App. 1st Cir. 2/24/16), 189 So.3d 1164, 1177-78, writ denied, 2016-0926 (La. 4/24/17), 220 So.3d 740. Further, the State is allowed reference to the defendant's post-arrest silence when the line of questioning is an attempt to summarize the extent of the police investigation and is not designed to exploit the defendant's failure to claim his innocence after his arrest in an effort to impeach his testimony or attack his

---

[10] Louisiana Code of Criminal Procedure article 771 provides, in pertinent part:

> In the following cases, upon the request of the defendant or the state, the court shall promptly admonish the jury to disregard a remark or comment made during the trial, or in argument within the hearing of the jury, when the remark is irrelevant or immaterial and of such a nature that it might create prejudice against the defendant, or the state, in the mind of the jury:
>
> * * *
>
> (2) When the remark or comment is made by a witness or person other than the judge, district attorney, or a court official, regardless of whether the remark or comment is within the scope of Article 770.
>
> In such cases, on motion of the defendant, the court may grant a mistrial if it is satisfied that an admonition is not sufficient to assure the defendant a fair trial.

defense. *Id.*

Detective Trosclair's statement that "they decided not to talk" was in response to the State's question about the extent of Detective Trosclair's investigation after the defendant was picked up on New Year's Eve. We find the reference to the defendant's (and/or his family's) decision not to talk was minimal and the trial as a whole was conducted fairly. Any reference to the defendant's silence after he was detained did not result in such substantial prejudice to him that he was deprived of any reasonable expectation of a fair trial.

The defendant next complains that the prosecutor asked Detective Trosclair whether he received any information, from any source, indicating that the defendant was not in the Cruze with Desmond and Payne. The defendant argues the prosecutor exploited the error in closing argument by arguing that there was no evidence introduced by the defense to contradict that the defendant was in the mall video footage.

The defendant failed to raise a contemporaneous objection to the State's question of whether Detective Trosclair received any information indicating that the defendant was not in the car involved in the shooting or to any of the State's remarks made during closing arguments. Thus, we are precluded from considering these arguments on appeal. See La. Code Crim. P. art. 841(A); *Johnson*, 775 So.2d at 680.

This argument is without merit.

In summary, we find no merit to the defendant's argument that without erroneously admitted evidence, the State had no evidence to prove the defendant participated in the shooting of Boyd and Carter. To the contrary, we find that, viewing the evidence in the light most favorable to the State, a rational trier of fact could have found beyond a reasonable doubt, and to the exclusion of every reasonable hypothesis of innocence, that the defendant was guilty of the second

21

degree murder of Carter and the attempted second degree murder of Boyd.

The defendant's first assignment of error is without merit.

## ASSIGNMENT OF ERROR NO. 2

In his second assignment of error, the defendant argues that his right to present a defense under the Sixth Amendment to the United States Constitution was violated. Specifically, the defendant contends that the trial court erred by: (1) excluding Carter's toxicology report; (2) limiting the scope of his cross-examination of Boyd; and (3) admitting hearsay testimony.

*Toxicology Report*

The defendant argues that the exclusion of Carter's toxicology report denied him the opportunity to cross-examine witnesses as to Carter's alleged intoxication at the time of the incident. According to the defendant, such questioning was imperative to contradict: (1) the State's theory that the defendant and his companions were the aggressors and that the incident was motivated by their desire to seek revenge on Carter; and (2) the reliability of Keoka Carter, Courtney Carter's sister, as a witness.

A criminal defendant has the constitutional right to present a defense. U.S. Const. amends. VI and XIV; La. Const. art. I, § 16; *Crane v. Kentucky*, 476 U.S. 683, 690, 106 S.Ct. 2142, 2146, 90 L.Ed.2d 636 (1986); *State v. Young*, 2020-01041 (La. 5/13/21), 320 So.3d 356, 359 (per curiam). The right to present a defense is so fundamental to the concept of a fair trial that even evidentiary rules are sometimes required to yield to it. *Chambers v. Mississippi*, 410 U.S. 284, 302, 93 S.Ct. 1038, 1049, 35 L.Ed.2d 297 (1973). In general, a defendant should be allowed to present evidence on any relevant matter. However, this right is not without limits and the State retains a legitimate interest in barring unreliable evidence from criminal trials. *Young*, 320 So.3d at 359-60; see also *Rock v. Arkansas*, 483 U.S. 44, 55, 107 S.Ct. 2704, 2712, 97 L.Ed.2d 37 (1987).

22

Relevant evidence is evidence having any tendency to make the existence of any fact that is of consequence to the determination of the action more probable or less probable than it would be without the evidence. La. Code Evid. art. 401. All relevant evidence is generally admissible. La. Code Evid. art. 402. The trial court has considerable discretion in determining the relevancy of evidence, and its ruling will not be disturbed absent an abuse of discretion. *State v. James*, 2002-2079 (La. App. 1st Cir. 5/9/03), 849 So.2d 574, 584. Further, La. Code. Evid. art. 103 provides that error may not be predicated upon a ruling which admits or excludes evidence unless a substantial right of the party is affected.

Prior to opening statements, the trial court heard arguments as to whether the toxicology report of Carter should be admitted into evidence.[11] The defendant argued that the presence of amphetamine and fentanyl in Carter's system was relevant to whether there was a "violent confrontation" in the mall that led the defendant to stalk the victims. The trial court found that the toxicology report was irrelevant, did not contain "any relevant evidence to any legitimate defense theory" in the case, and was thus inadmissible.

Additionally, Carter's sister, Keoka, testified that she spoke to Carter every morning, that he was not involved in narcotics, and that she was "quite sure" she would know if he was. After her testimony, the defense again asked the trial court to allow the introduction of the toxicology report into evidence to show Carter "was not squeaky clean, as he ha[d] been portrayed[,]" and "may have had other enemies." The trial court once more ruled that the toxicology report was inadmissible. The trial court stated the report "could be used to impeach [Keoka], but the prejudicial effect still outweighs the probative value."

---

[11] The toxicology report was separate from the Coroner's Report, which was introduced into evidence. We note that the Coroner's Report included the results of Carter's drug screen, which indicated the presence of amphetamine and methamphetamine.

We find that the trial court's ruling that excluded the toxicology report was not an abuse of discretion. As noted by the trial court, the report did not contain any relevant evidence which may have been related to any legitimate defense theory. Moreover, although the defendant argues on appeal that he wanted to use the report to impeach Keoka Carter's credibility, at no point during the trial did the defendant actually seek to use the report to do so.

*Cross-Examination of Boyd*

The defendant also contends that the scope of his cross-examination of Boyd was impermissibly limited as to: (1) whether Boyd's probation was revoked on prior charges; and (2) evidence of the material witness bond that compelled his testimony at trial.

On cross-examination, the defendant sought to elicit testimony regarding Boyd's alleged probation revocation, at which point the State objected and the trial court sustained the objection after an off-record discussion. On appeal, the defendant contends the trial court erred in excluding this information.

The Louisiana Code of Evidence provides that the credibility of a witness may be impeached by introducing evidence that the witness has been convicted of a crime. Evidence of an arrest, an arrest warrant, indictment, prosecution or acquittal may not be used to impeach the general credibility of the witness. La. Code Evid. art. 609.1.

Initially, we note the defense failed to proffer evidence that Boyd's probation had been revoked. Only matters contained in the record can be reviewed on appeal. *State v. Lavy*, 2013-1025 (La. App. 1st Cir. 3/11/14), 142 So.3d 1000, 1007, writ denied, 2014-0644 (La. 10/31/14), 152 So. 3d 150. Because the defendant failed to make a proffer, he is barred procedurally from advancing this assignment of error. *Id.* Moreover, whether Boyd's probation had been revoked was beyond the scope of La. C.E. art. 609.1. *Id.*

24

Prior to Boyd's testimony, the State sought to limit references to Boyd's arrest on a material witness bond. After hearing arguments from both sides, the trial court ruled that evidence of arrests, including the arrest on the material witness bond, was inadmissible, noting, however, that such evidence could come in during the course of Boyd's testimony in connection with a deal or some type of bias.

Under a material witness bond, a judge shall issue a warrant for the arrest of a witness whose testimony is essential to the matter, and it is shown that it may become impracticable to secure the presence of the person by subpoena. Under these circumstances, the witness shall be arrested and held in the parish jail, or another suitable place designated by the court, until he gives an appearance bond or until the testimony is given in the cause. La. R.S. 15:257. The purpose of this statute is not penal in nature, as the object is not punishment for wrongdoing, but is to provide a procedure to prevent a material witness from removing himself from or being taken from the jurisdiction of the court and to insure testimony from the material witness. *Cooks v. Rapides Parish Indigent Defender Bd.*, 96-811 (La. App. 3rd Cir. 12/11/96), 686 So.2d 63, 66, writ denied, 97-0409 (La. 3/27/97), 692 So.2d 398. As such, a material witness bond is not a conviction as contemplated by La. Code Evid. art. 609.1 and is not admissible to impeach the general credibility of the witness. Accordingly, it was not error for the trial court to preclude the defendant from questioning Boyd about his material witness bond. Moreover, although the defendant argues on appeal that he should have been allowed to impeach Boyd in connection with his statement that he wanted to be present for trial, at no point during the trial did the defendant actually seek to do so.

*Alleged Hearsay Evidence*

The defendant next contends that inadmissible hearsay testimony was

25

admitted at trial, and the proliferation of inadmissible hearsay establishes that the errors were not harmless beyond a reasonable doubt due to the alleged lack of other evidence upon which the convictions were based. Specifically, the defendant complains of the following alleged hearsay: (1) Detective Trosclair's testimony that other members of law enforcement identified Payne and Barrow in the mall video footage; (2) Detective Trosclair's testimony that Barrow had a girlfriend, that the girlfriend owned or rented the Cruze, and that she let Barrow use the car on the day of the shooting; (3) Detective Trosclair's testimony regarding discussions with Mara Jackson, who he indicated was Desmond's girlfriend; and (4) statements of the defendant's co-defendant introduced through Detective Trosclair and through the prosecutor in closing argument.

At the outset, we note that the defendant failed to object to: (1) Detective Trosclair's testimony that other members of law enforcement identified Payne and Barrow in the mall video footage; and (2) Detective Trosclair's testimony that Barrow had a girlfriend, that the girlfriend owned or rented the Cruze, and that she let Barrow use the car on the day of the shooting. Thus, we are precluded from considering these arguments on appeal. See La. Code Crim. P. art. 841(A); *Johnson*, 775 So.2d at 680.

Hearsay is a statement, other than one made by the declarant while testifying at trial, offered in evidence to prove the truth of the matter asserted. La. Code Evid. art. 801(C). Hearsay is generally inadmissible unless it falls within an exception provided by the Code of Evidence or other legislation. La. Code Evid. art. 802. However, if the statement is offered for any other purpose, it is not hearsay. *State v. Patton*, 2010-1841 (La. App. 1st Cir. 6/10/11), 68 So.3d 1209, 1219-20. The improper introduction of hearsay evidence will be considered harmless error if it is determined the hearsay evidence was cumulative and corroborative of other properly admitted evidence and did not contribute to the

26

verdict. *State v. Dantin*, 2019-0407 (La. App. 1st Cir. 12/17/19), 291 So.3d 1096, 1102.

*Testimony regarding the Interview with Mara Jackson*

During his direct examination, Detective Trosclair testified that when the defendant was picked up following the New Year's Eve car chase, he was with Mara Jackson, Desmond's girlfriend. Detective Trosclair testified that he interviewed Jackson the night of the New Year's Eve car chase regarding her role in the Christmas Eve shooting. The State asked Detective Trosclair if Jackson ever indicated to him that she received a phone call from Desmond. Defense counsel objected to the question as hearsay. The trial court stated: "It's a little bit premature. I'm going to overrule the objection at this time – and not to make any hearsay statements." The following exchange then occurred:

Q: Did she ever indicate to you that she received a telephone call that day, Christmas Eve Day, from Desmond Verdin?

A: She did.

Q: All right, and based upon that phone call, did she tell you what action she took?

A: She did – she said she went to go pick up "Bubba[,"] which is Lorenzo Barrow, from the mall.

Q: Did she ever indicate to you that she was asked to go pick up [the defendant]?

A: No.

At this point, the trial court asked counsel to approach the bench, and there was an off-record discussion. After the discussion, the State changed the line of questioning.

The only hearsay present in this exchange is Detective Trosclair's testimony that Jackson "said she went to go pick up 'Bubba[,'] which is Lorenzo Barrow,

27

from the mall." However, we find the admission of this hearsay evidence was harmless error because it was cumulative and corroborative of the mall video footage that showed Barrow at the mall after the shooting. Moreover, it cannot be said that this testimony contributed to the verdict. The jury viewed the mall video footage of Payne getting into the driver's side of the Cruze, Desmond entering the passenger side of the vehicle, and the Cruze passing by the defendant's last known whereabouts within one minute of the defendant's last appearance on the video footage. The guilty verdict is surely unattributable to the error of allowing into evidence Jackson's statement that she picked up Barrow at the mall. See *State v. Stokes*, 2014-1562 (La. App. 1st Cir. 6/17/15), 175 So.3d 419, 424.

Moreover, the defendant did not ask for an admonishment or mistrial. When the trial court sustains an objection and defense counsel fails to request an admonishment or a mistrial, the defendant cannot later raise the issue on appeal. *State v. Johnson*, 2007-0634 (La. App. 1st Cir. 9/19/07), 2007 WL 2713536, *3 (unpublished).

*Hearsay Statements of a Co-Defendant*

Finally, the defendant contends hearsay statements of a co-defendant were introduced through the testimony of Detective Trosclair that the men were shopping in Kenner on December 24 and through the prosecutor in closing argument that Payne and Desmond were the two men who ran from the car that crashed on New Year's Eve.

Detective Trosclair testified that, pursuant to a search warrant of the Honda involved in the New Year's Eve car chase, a receipt dated December 24, 2019 was located. Detective Trosclair was asked about the relevance of the receipt to Payne, and answered as follows: "When we eventually picked up [Payne], his story was that he was in New Orleans all day— " Defense counsel objected, and the trial court sustained the hearsay objection. The defendant did not ask for an

28

admonishment or mistrial, and is therefore precluded from raising the issue on appeal. See *Johnson*, 2007 WL 2713536, at *3. The defendant contends this statement was emphasized in closing argument, but the transcript does not support this contention.

The defendant further contends that hearsay statements of a co-defendant were introduced through the prosecutor's statement during closing argument that "Desmond and [Payne] had just run from the police" following a car crash on New Year's Eve. No objection was made to this statement. Moreover, there was no reference by the prosecutor to any statement by a co-defendant.

The defendant's second assignment of error is without merit.

## ASSIGNMENT OF ERROR NO. 3

In his third assignment of error, the defendant argues that the testimony of Detectives Falgout and Trosclair regarding the New Year's Eve car chase was irrelevant, hearsay, prejudicial evidence of another crime to implicate the defendant by innuendo and association with gun and drug use. He contends that defense objections to any testimony about the chase, based on hearsay, irrelevance, and prejudicial other crimes evidence, were overruled.

Our review of the record does not indicate that defense counsel objected to any testimony of the New Year's Eve car chase on the basis of relevance. It is well-settled that defense counsel must state the basis for his objection when making it and point out the specific error of the trial court. *State v. Duhon*, 2018-0593 (La. App. 1st Cir. 12/28/18), 270 So.3d 597, 631, writ denied, 2019-0124 (La. 5/28/19), 273 So.3d 315. A defendant is limited on appeal to grounds for an objection articulated at trial. A new basis for objection cannot be raised for the first time on appeal. *Id.* Thus, the defendant is procedurally barred from objecting to the testimony of Detectives Falgout and Trosclair regarding the New Year's Eve car chase as irrelevant.

29

At the outset of Detective Falgout's testimony, the State asked him: "[W]hat was your understanding of why you got in that car chase; or what was the purpose of trying to stop that vehicle?" Detective Falgout replied: "Dispatch received [a] call that the subjects involved in the shooting were possibly in that car –." At this point, defense counsel objected to the statement as hearsay and, outside of the presence of the jury, the parties presented arguments as to whether the statement should be admitted. The State contended that the statement was not being offered for the truth of the matter asserted, but to indicate what information Detective Falgout received in the course of his duties. The State further indicated that the information was that some of the suspects involved in the shooting were in the vehicle, but not the defendant. After seeking clarification that the car chase was a separate event from the drive-by shooting, the trial court overruled the objection.

We find that what dispatchers advised over the radio to Detective Falgout was not hearsay because it was not offered for the truth of the matter asserted. See La. Code Evid. art. 801(C). Detective Falgout was merely setting out how the New Year's Eve car chase unfolded. Such testimonial evidence by a police officer is admissible to explain the sequence of events leading to the defendant's arrest when there is no indication the evidence is presented to prejudice the defendant. *Dantin*, 291 So.3d at 1103. Thus, it was not error for the trial court to overrule the defendant's objection to this testimony.

After the Honda crashed, a pistol was located on the street. Detective Falgout testified that he did not see the pistol being thrown out of the vehicle. The State then asked: "[D]id someone see it thrown out of a vehicle?" Defense counsel objected on the basis of hearsay, and the trial court sustained the objection. The defendant did not ask for an admonishment or mistrial, and is therefore precluded from raising the issue on appeal. See *Johnson*, 2007 WL 2713536, at *3. Detective Trosclair was also asked about his understanding of where the gun

came from. Defense counsel objected on the basis that the State was asking for speculation. The trial court overruled the objection, and Detective Trosclair proceeded to testify that officers were not sure whether one of the fleeing suspects tossed the gun or if it had been tossed out of the car during the chase. (R 721) He further testified that the gun that was found was not involved in the Christmas Eve shooting. We find no error in the trial court's ruling. Detective Trosclair's testimony was not based on speculation.

Detective Falgout testified that after the car crashed, units were still trying to locate the two subjects that fled. According to Detective Falgout, he received a phone call from the Chief of Detectives "saying that he received a call that a white-". Defense counsel objected on the basis of hearsay. The trial court sustained the objection. The State then rephrased the question as follows: "All right, so you got a call, from dispatch; and it was your understanding that they received information from [the Chief of Detectives]-". Defense counsel objected; the trial court overruled the objection, indicating that Detective Falgout did not reveal the content of the statements, just that he received it. Detective Falgout proceeded to testify that upon receiving the information, he searched for a white vehicle that was in the neighborhood to pick up the two subjects that fled from the crashed vehicle. As with the above complained-of testimony, we find it was not error for the trial court to overrule the defendant's objection to this testimony. Detective Falgout was merely setting out why he searched for the white vehicle in which the defendant was ultimately located. There was no indication the evidence was presented to prejudice the defendant. See Dantin, 291 So.3d at 1103.

Finally, we address the defendant's argument in this assignment of error that the testimony regarding the New Year's Eve car chase contained impermissible evidence of other crimes. Generally, evidence of other crimes committed by the defendant is inadmissible due to the "substantial risk of grave prejudice to the

31

defendant." *State v. Tilley*, 99-0569 (La. 7/6/00), 767 So.2d 6, 22, cert. denied, 532 U.S. 959, 121 S.Ct. 1488, 149 L.Ed.2d 375 (2001).

Detective Falgout testified that in addition to the two suspects who fled from the Honda, a third person remained in the vehicle. This suspect was arrested for aggravated flight and possession of methamphetamines. The defendant argues that this evidence, along with the evidence that a gun was found after the Honda crashed, implicated the defendant "by innuendo and association" with gun and drug use. We disagree with the defendant's characterization of this evidence. There was no suggestion by either Detective Falgout or Trosclair that the defendant was involved in the car chase, fled from the Honda, or was in possession of drugs or guns. Because there was no evidence of other crimes committed by the defendant, the evidence was admissible.

The defendant's third assignment of error is without merit.

### ASSIGNMENT OF ERROR NO. 4

In his fourth assignment of error, the defendant argues that the trial court erred in admitting Boyd's out of court taped statements as direct evidence, rather than relying on his in-court testimony.

During his direct examination at trial, Boyd initially testified that he knew two guns were used in the shooting, and that they both were pointed out of the same back window, but that he did not know if there was one person holding two guns or two people each holding one gun. Then, the State, in an apparent attempt to refresh his recollection, asked Boyd if he remembered giving statements to Detective Trosclair at the hospital and then later at the sheriff's office. Boyd stated that he did remember giving both of those statements. The State then asked Boyd if he remembered telling Detective Trosclair that there were two shooters because one person was holding a gun with two hands. At this point, defense counsel objected to the State telling Boyd the contents of his statement, instead of letting

32

Boyd review the statement himself, and the trial court sustained the objection.[12] The State then asked Boyd if the previous questions refreshed his memory, and Boyd responded in the affirmative. In response to the State repeating its question of if there was one shooter or two shooters, Boyd stated there were two people and that this information was consistent with what he told Detective Trosclair on the day of the shooting.

Detective Trosclair testified right after Boyd, and during his testimony, the State played clips from both of Boyd's interviews where he stated that he thought there were two shooters. Prior to playing the interview clips and outside the presence of the jury, the State informed the court and defense counsel that it intended to play the interview clips through Detective Trosclair's testimony pursuant to La. Code Evid. art. 801(D)(1)(b) and in response to the defense's alleged attack on Boyd's credibility by asking about his prior convictions and alleged probation revocation. The trial court allowed the State to play the clips, over defense objection, finding that the defense's intent in bringing up Boyd's prior record was to attack his statements.

We disagree with this finding. Pursuant to La. Code Evid. art. 801(D)(1)(b), a statement is not hearsay if the declarant testifies at the trial or hearing and is subject to cross-examination concerning the statement, and the statement is consistent with his testimony and is offered to rebut an express or implied charge against him of recent fabrication or improper influence or motive. The State clearly intended to bolster Boyd's testimony by playing the interview clips. Boyd initially testified he did not remember how many shooters were in the vehicle, and was only able to say there were two once the State reminded him of his interviews

---

[12] On appeal, the defendant complains that, although his objection to this line of questioning was sustained, "the [State]'s testimony was already given," and the State continued to ask leading questions. The defense did not lodge any other objections besides the initial objection, which was sustained. Moreover, the defendant did not ask for an admonishment or mistrial at any time and is precluded from raising the issue on appeal. *Johnson*, 2007 WL 2713536 at *3.

with Detective Trosclair. In its arguments in support of admitting the statements through Detective Trosclair, the State alleged that it had "the right to put in the statements, to bolster [Boyd's] credibility." Moreover, the State alleged that, by asking Boyd about his prior convictions, the defense attacked the credibility of "the most important witness ... in the case."

Again, we disagree. Boyd never denied that there were two shooters, he merely stated that he did not remember. Upon further questioning by the State, Boyd recalled his interviews with Detective Trosclair and confirmed that there were two shooters. On cross-examination, the defense did not ask Boyd about the number of shooters or question the veracity of his statement regarding the number of shooters; thus, the defense did not suggest that Boyd's testimony was a recent fabrication or the result of improper influence or motive. Additionally, while defense counsel did attempt to get Boyd to admit he was present at trial under a material witness bond, he was prohibited from doing so after a discussion outside of the presence of the jury. Therefore, we find there was no charge of improper influence relating to Boyd's testimony.

Accordingly, it was error for the trial court to admit Boyd's out of court statements through Detective Trosclair's testimony. Nevertheless, the improper introduction of hearsay evidence will be considered harmless error if it is determined that the hearsay evidence was cumulative and corroborative of other properly admitted evidence and did not contribute to the verdict. *Dantin*, 291 So.3d at 1102. The trial court's error in overruling defense counsel's objection and allowing these taped statements to be admitted into evidence was harmless beyond a reasonable doubt. The contents of these taped statements were merely cumulative and corroborative of Boyd's previously admitted testimony where he stated there were two shooters.

The defendant's fourth assignment of error is without merit.

## ASSIGNMENT OF ERROR NO. 5

In his fifth and final assignment of error, the defendant argues that his sentences are unconstitutionally excessive.

The Eighth Amendment to the United States Constitution and Article I, § 20, of the Louisiana Constitution prohibit the imposition of cruel or excessive punishment. Although a sentence falls within statutory limits, it may be excessive. *State v. Sepulvado*, 367 So.2d 762, 767 (La. 1979). A sentence is considered unconstitutionally excessive if it is grossly disproportionate to the seriousness of the offense or is nothing more than a purposeless and needless infliction of pain and suffering. A sentence is considered grossly disproportionate if, when the crime and punishment are considered in light of the harm done to society, it shocks the sense of justice. *State v. Livous*, 2018-0016 (La. App. 1st Cir. 9/24/18), 259 So.3d 1036, 1044, writ denied, 2018-1788 (La. 4/15/19), 267 So.3d 1130. The trial court has great discretion in imposing a sentence within the statutory limits, and such a sentence will not be set aside as excessive in the absence of a manifest abuse of discretion. *State v. Spikes*, 2017-0087 (La. App. 1st Cir. 5/9/03), 228 So.3d 201, 204. Louisiana Code of Criminal Procedure article 894.1 sets forth the factors for the trial court to consider when imposing sentence. While the entire checklist of Article 894.1 need not be recited, the record must reflect the trial court adequately considered the criteria. *Id.* The goal of Article 894.1 is to have the sentencing court articulate a factual basis for the sentences, not rigid or mechanical compliance with the Article's provisions. *Id.*

Where the record clearly shows an adequate factual basis for the sentence imposed, remand is unnecessary even where there has not been full compliance with Article 894.1. See *State v. Lanclos*, 419 So.2d 475, 478 (La. 1982). The trial court should review the defendant's personal history, his prior criminal record, the seriousness of the offenses, the likelihood that he will commit another crime, and

35

his potential for rehabilitation through correctional services other than confinement. *Spikes*, 228 So.3d at 204-05. On appellate review of a sentence, the relevant question is whether the trial court abused its broad sentencing discretion, not whether another sentence might have been more appropriate. *State v. Thomas*, 98-1144 (La. 10/9/98), 719 So.2d 49, 50 (per curiam).

At the time of sentencing, the trial court made several findings: the defendant's conduct during the commission of the offenses manifested a deliberate cruelty to the victims; the defendant was in need of correctional treatment that could be provided most effectively by his commitment to an institution; there was an undue risk that, during a period of a suspended sentence or probation, the defendant would commit another crime; the defendant knowingly created a risk of death or great bodily harm to more than one person; the defendant used threats of or actual violence in the commission of the crimes; the offenses resulted in a significant permanent injury or significant economic loss to the victims' families; the defendant used a dangerous weapon in the commission of the offenses; the defendant endangered human life by discharging a firearm during the commission of the offenses; and the offenses had an element of use of attempted threat and use of physical force against the person or their property.

A conviction for second degree murder in Louisiana mandates a sentence of life imprisonment at hard labor without benefit of parole, probation, or suspension of sentence. La. R.S. 14:30.1(B). Nevertheless, La. R.S. 15:574.4(F) provides that any person serving a sentence of life imprisonment for a conviction of second degree murder, who was under the age of eighteen years at the time of the commission of the offense, and whose indictment was on or after August 1, 2017, shall be eligible for parole consideration if the offender has served twenty-five years of the sentence imposed, assuming other conditions are also met. In accordance with this provision, the trial court sentenced the defendant to life in

prison without the possibility of probation or suspension of sentence, but with the possibility of parole. Thus, the defendant's sentence for second degree murder is statutorily required and is not excessive.

The sentencing range for an attempted second degree murder conviction is ten to fifty years imprisonment at hard labor without the possibility of probation, parole, or suspension of sentence. La. R.S. 14:27(D)(1)(a). The trial court sentenced the defendant to the statutory maximum of fifty years without the possibility of probation, parole, or suspension of sentence. Louisiana Revised Statutes 15:574.4(J)(1) likewise provides that any person serving a term or terms of imprisonment that results in a period of incarceration of twenty-five years or more, and who was under the age of eighteen years at the time of the commission of the offense, shall be eligible for parole consideration if the offender has served at least twenty-five years of the sentence imposed, provided other conditions are met during the period of incarceration.

We find that as to count two, the defendant was improperly sentenced to fifty years without benefit of parole in violation of La. R.S. 15:574.4(J). Because an illegal sentence may be corrected at any time by the court that imposed the sentence or by an appellate court on review, we amend the attempted second degree murder sentence to provide that the defendant is eligible for parole after twenty-five years in accordance with La. R.S. 15:574.4(J). Further, the Department of Corrections is ordered to revise the defendant's master prison record to reflect that his sentence for attempted second degree murder is no longer without benefit of parole and, in accordance with the criteria in La. R.S. 15:574.4, to reflect an eligibility date for consideration by the Board of Parole once the conditions contained therein are met. La. Code Crim. P. art. 882; see also State v. Thompson, 2022-0314 (La. App. 1st Cir. 1/10/23), 2023 WL 142384, *20 (unpublished).

37

## PATENT ERROR REVIEW

Under the authority of La. Code Crim. P. art. 920(2), this court routinely reviews appellate records for patent error. *State v. Porche*, 2019-0278 (La. App. 1st Cir. 9/27/19), 288 So.3d 802, 804.

Louisiana Code of Criminal Procedure article 930.8(C) provides that, at the time of sentencing, the trial court shall inform the defendant of the prescriptive period for seeking post-conviction relief. However, a failure to do so by the trial court has no bearing on the sentence and is not grounds to reverse the sentence or remand the case for resentencing. *State v. Jones*, 97-1687 (La. App. 1st Cir. 5/15/98), 714 So.2d 819, 826, writ denied, 98-1597 (La. 10/30/98), 723 So.2d 975. We note that neither the transcript nor the commitment order reflects that the trial court advised the defendant of the provisions of La. Code Crim. P. art. 930.8. Accordingly, the trial court is ordered to send written notice of the prescriptive period for seeking post-conviction relief to the defendant within ten days of the rendition of this opinion and to place confirmation of such in the record of these proceedings with the clerk of the trial court. *State v. Lathers*, 2005-0786 (La. App. 1st Cir. 2/10/06), 924 So.2d 1038, 1045 writ denied, 2006-1036 (La. 11/3/06), 940 So.2d 659; *State v. Lewis*, 94-2145 (La. App. 1st Cir. 11/9/95), 665 So.2d 38, 43; *Jones*, 714 So.2d at 826.

**CONVICTION AND SENTENCE ON COUNT 1 AFFIRMED; CONVICTION AFFIRMED AND SENTENCE AMENDED ON COUNT 2 TO REFLECT THE BENEFIT OF PAROLE, AND AFFIRMED AS AMENDED; REMANDED WITH INSTRUCTIONS.**

STATE OF LOUISIANA

COURT OF APPEAL

FIRST CIRCUIT

2022 KA 1178

STATE OF LOUISIANA

VERSUS

TORRANCE VERDIN

**WELCH, J., dissenting.**

I respectfully disagree with the majority opinion in this matter. The evidence in this case was woefully insufficient to establish the defendant's identity as a perpetrator of the crime beyond a reasonable doubt. Aside from the testimony of victim Jason Boyd, which was ambiguous at best, almost the entirety of the State's case in establishing the defendant as the perpetrator of the crime was predicated on the speculative testimony of Detective Trosclair, who merely reviewed the video surveillance footage, and his inference of guilt by association. The majority's decision to affirm the defendant's conviction given the total lack of evidence, eyewitness identification, or admission of guilt is a travesty of justice.

According to the testimony of Boyd, he and Courtney Carter were at Victoria's Secret store in the mall when Carter was approached by three guys, and words were exchanged. After Boyd and Carter left that store, the three guys talked to them some more, then walked off. Boyd did not know these three people. When Boyd and Carter left the mall, they drove down Bayou Gardens and, from there, a "back road" behind the mall. When they stopped at a red light, Boyd heard gunshots. Boyd testified that he saw a white car and two guns coming from the back window. When Boyd was asked on direct examination if he could tell it was one person with two guns or two people each holding a gun, Boyd stated, "I can't even tell you that[,]"

and then, "all I seen was two guns coming out the window." The prosecutor then reminded Boyd that, when he was in the hospital, he gave a statement to Detective Trosclair that it was two people with guns because one person was holding the gun with two hands. Boyd did not respond, the defense counsel objected to the prosecutor's question as leading, and the objection was sustained.[1] The prosecutor then asked, "[D]o you recall if it was two people shooting out of the backseat; or if it was just one?" Boyd replied, "Two people." When Detective Trosclair was asked what Boyd told him about how many people were holding guns, Detective Trosclair testified: "He was real specific actually and said that there was two people holding the guns. There were two separate people that were shooting out of the back driver's side window."

In his brief statement given to the police, Boyd indicated there were two people in the back seat and no front-seat passenger. Later in the trial, the State was allowed to play the audio statement that Boyd gave Detective Trosclair at the hospital. In this audio statement, Boyd indicated that he saw two guns out of the back driver-side window. Boyd was asked if he could tell whether it was two people shooting or one person shooting two guns. Boyd responded that "it was two people because . . . he had his hand out the window like this[.]" Detective Trosclair interrupted at this moment and stated, "So he had two [inaudible], two hands on the gun, ok[.]" Thus, *Boyd could not and did not identify the defendant as the shooter nor did he place the defendant in the vehicle from which the shots came.*

Detective Trosclair compiled the most pertinent segments from the video

---

[1] The following exchange then took place:

> Q. Okay, were you able to see who it was?
> A. No, sir.
> Q. Okay, you were just looking at the guns?
>
>         \* \* \*
>
> A. Yes, sir.

Defense counsel objected to his line of questioning as leading, and it was sustained.

surveillance footage he was given, for purposes of trial, and while each segment was played for the jury, Detective Trosclair explained and/or narrated what was being seen in the video. The crux of Detective Trosclair's testimony, which formed the State's theory of the case, was that Payne and Desmond left the mall and got into their white Chevrolet Cruze. Payne was the driver. After driving around the mall parking lot for several minutes, Payne picked up the defendant. They then followed Boyd and Carter and shot them at a red light. However, this theory is problematic because *the State did not present any conclusive evidence that Payne actually picked up the defendant at the mall or that the defendant was in the Cruze.* The defendant's DNA was not found in the backseat of the Cruze nor was there any mall video surveillance footage that showed the defendant being picked up by Payne. In fact, the defendant had separated from Payne and Desmond at the mall and walked around alone. Detective Trosclair testified that at 11:15 a.m., the defendant exited the H&M store at the mall by himself. The video clip showed the defendant turn right, then walk along the side of the mall and then out of camera range. According to Detective Trosclair, the defendant would have been standing near Dillard's; the defendant was in a "blind spot" that none of the other cameras at the mall could pick up. Detective Trosclair then posited that during the time the defendant was leaving H&M, Payne drove the Cruze from J.C. Penney's on the other side of the mall to the roadway that passed in front of Dillard's. *While it is never seen on video,* Detective Trosclair suggests it was at this point that Payne picked up the defendant, then drove to the scene of the shooting. According to Detective Trosclair, after the defendant walked off camera near Dillard's, the detective never saw the defendant again in any other video.

At the hearing of the defendant's motion for new trial wherein the defendant argued his identity was not proven, the prosecutor responded in pertinent part:

> And we saw [the defendant] coming out of H&M, going to the

parking lot. And at the same time we know we saw the other vehicle being driven by … Payne coming from the backside to go pick him up. And then low and behold, he disappears. And it was just a matter of seconds.

And the jury, obviously, put it together. It's like no, there's nothing else. There was no other plausible explanation, none whatsoever, that [the defendant] had to be in that vehicle.

Despite the prosecutor's assertion, the defendant did not disappear within "just a matter of seconds." A review of the video indicates that after the defendant went out of view of any mall camera, he was likely standing in front of Dillard's. The defendant walked out of view at about the 11:15:33 mark. At around this time, the white Cruze, at least as identified by Detective Trosclair, can be seen turning and heading down the parking lot road that passes in front of H&M and Dillard's. Around 35 seconds later, the white vehicle goes out of view just as the defendant had gone out of view. Following this, Detective Trosclair in his testimony tracked the movement of the white Cruze over the next several minutes. A review of the videos indicates the Cruze was about 30 to 40 seconds behind the Charger. No one can be identified in the Cruze because the windows are up and tinted. The actual shooting was not captured on video.

From this testimony and the video, the jury could not have rationally concluded beyond a reasonable doubt that Payne picked up the defendant at the mall. The defendant was seen on the video talking on a cell phone while walking toward Dillard's. He could have remained in front of Dillard's for several minutes while the shooting took place; or he could have been picked up at the mall by someone else. It is not clear from Boyd's testimony that he actually saw three people in the white car or just two guns from the back window and, therefore, assumed there were three people in the car. Even if there were three people in the car, and assuming it was Payne in the white Cruze responsible for the drive-by shooting, Payne could have picked up a third person as he was driving from the mall or along the route ostensibly

following the Charger.[2] Moreover, even if the defendant was in the Cruze at the time of the incident, there is no evidence to prove he was a willing participant in the drive-by shooting, much less one of the shooters. If, in fact, Payne was driving and Desmond was in the back seat, Desmond could have fired from the back seat while Payne, in the driver's seat, also shot out the back window.

The State's theory of the case was that the shooting of Carter was motivated by revenge. Carter's sister testified at trial that years ago Carter killed Gerard Jones, Desmond's father, and was jailed for eleven years for his crime.[3] Gerard Jones, however, was not the defendant's father. The defendant and Desmond are half-brothers because they have the same mother. At the time of the shooting, the defendant was fifteen years old, Desmond was 23 years old, and Tyler was 27 years old. Thus, while Desmond may have been motivated by revenge, it was mere conjecture by the State to attribute that same motivation to the defendant over a man who was not the defendant's father.

Upon a careful review of the entire record, I believe that the jury did not act rationally in finding the defendant guilty of second degree murder and attempted second degree murder. The evidence introduced at trial did not establish beyond a reasonable doubt that the defendant was one of the shooters or that he was even in the car at the time of the shooting. Because of a lack of direct evidence or eyewitness testimony, the jury was presented with the reasonable hypothesis that the defendant was still at the mall at the time of the shooting or had been picked up by someone else at the mall (or both). Moreover, even if the defendant had been picked up at the

---

[2] According to Detective Trosclair, the third person could not have been Barrow because he was still at the mall at the time of the shooting. The police never located Barrow after the incident. It was twenty to thirty minutes from the time the defendant went off camera at the mall until the shooting. While the white Cruze was picked up on several street cameras about 30 to 40 seconds behind the Charger, most of this time spent driving and/or stopping by Payne was not on camera or, at least, was not introduced into evidence.

[3] In his opening statement, the prosecutor stated Carter was convicted of manslaughter in 2005 or 2006.

mall by Payne, the State did not establish that the defendant was one of the shooters or had anything to do with the shooting. In the blind spot at the mall, Payne could have gotten in the back seat and told the defendant to drive. Thus, after leaving the mall, the defendant could have been the driver of the Cruze and told nothing more than to drive the car with Payne and Desmond in the back seat with firearms.

The State suggests that even if the defendant was not in the Cruze at the time of the shooting, the evidence was sufficient to establish he was nonetheless a principal. According to the State, when Desmond and the defendant split up at the mall, Desmond walked in the direction of his car while the defendant was "following or still hunting for the victims." The State suggests that all of the defendant's actions and movements inside and outside of the mall indicated he was aiding Desmond in his search for the victims and was the "lookout" while Desmond retrieved the car.

These assertions by the State are mere conjecture. As noted, there was no audio on any of the mall videos. There was no evidence from any cell phone to suggest any discussion or plan to follow and to ultimately shoot the victims. The most the evidence reveals is that the defendant at different times was walking by himself inside and outside the mall and, while outside, talking on his cell phone. During the very brief conversation among Desmond, Payne, and Carter inside the mall, the defendant appeared to have little to no interest at all. The State's assertion notwithstanding, it is not at all clear why these men needed a fifteen-year-old boy to act as a scout when any of the men -- Desmond, Payne, or Barrow -- could have kept an eye on the victims himself. Moreover, even if at the behest of his older half-brother, the defendant had played a role in keeping an eye on the whereabouts of the victims, there is nothing in the evidence to indicate the defendant knew or was aware of what Desmond and/or Payne may have been discussing or planning regarding the victims. Thus, I find that the State failed to meet its burden of excluding every reasonable hypothesis of innocence in this case.

While I am mindful not to substitute my judgment for that of the jury, it is evident that, in determining the defendant's guilt, the jury engaged in impermissible speculation and found the defendant was guilty because of his association with Desmond and Payne and what Detective Trosclair thought might have happened. Under the facts of this case, any rational trier of fact, after viewing all of the evidence as favorably to the prosecution as a rational factfinder can, would necessarily have a reasonable doubt as to the defendant's guilt under the **Jackson v. Virgina**, 443 U.S. 307, 319, 99 S.Ct. 2781, 2789, 61 L.Ed.2d 560 (1979) standard. That is, no rational trier of fact could have found that, under these circumstances, the defendant, to the exclusion of everyone else, was one of the shooters or a principal to the shooting. It is incomprehensible to me that a fifteen year-old kid will be and is serving life imprisonment based solely on hypothetical conjecture and guilt by association. Accordingly, I would reverse the defendant's convictions and sentences.

Thus, I respectfully dissent.